In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1925
UNITED STATES OF AMERICA,
 Plaintiff-Appellee,
 v.

RUSSELL CHARLES TAYLOR,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 1:20-cr-00116-TWP-DML-1 — Tanya Walton Pratt, Chief Judge.
 ____________________

 ARGUED DECEMBER 6, 2022 — DECIDED MARCH 24, 2023
 ____________________

 Before ROVNER, HAMILTON, and ST. EVE, Circuit Judges.
 HAMILTON, Circuit Judge. This direct criminal appeal pre-
sents an unusual question about the validity of a search war-
rant. The text of the warrant appears to have been altered by
police oﬃcers to expand its scope, without any indication that
the issuing judge approved the changes.
 In the autumn of 2014, Indiana law enforcement began in-
vestigating appellant Russell Taylor for suspected child
2 No. 22-1925

pornography and bestiality crimes. The primary source of in-
criminating information against Taylor was “Jane Doe,” a
woman with whom Taylor and his wife were intimately in-
volved. At relevant times, Doe was also intimately involved
with two members of law enforcement, one active and one re-
tired, who were involved in the investigation.
 More than six months later, in April 2015, law enforcement
presented a warrant application to a state-court judge. The
warrant aﬃdavit sought to establish probable cause to search
Taylor’s residence for evidence of both child pornography
and bestiality. The aﬃdavit did not disclose that two of the
law enforcement oﬃcers involved in the investigation were or
had been potentially competing with Taylor for Doe’s aﬀec-
tions. Based on that aﬃdavit, the judge signed a typed war-
rant that authorized law enforcement to search Taylor’s resi-
dence for evidence of child pornography. The typed warrant
did not mention bestiality. At a time unknown and under cir-
cumstances also unknown, the lead detective in the case ap-
parently made handwritten alterations to the warrant, adding
“bestiality” to the warrant’s scope.
 When oﬃcers executed the altered warrant, they found
lots of evidence of child pornography, including evidence
that Taylor was producing and distributing it. Ironically,
though, the oﬃcers found no evidence of crimes of bestiality.
Facing federal child pornography charges, Taylor moved to
suppress the evidence obtained in that search. Both that mo-
tion and his request for a Franks hearing were denied. See
Franks v. Delaware, 438 U.S. 154 (1978). Taylor ultimately pled
guilty to multiple counts relating to child pornography and
was sentenced to 324 months in prison. Taylor now appeals
those denied motions, arguing that the warrant aﬃdavit
No. 22-1925 3

included material false statements and omissions, and that
the warrant’s handwritten alterations rendered it invalid.
 We agree with Taylor that the aﬃdavit did not support
probable cause to search for evidence of child pornography,
but we ﬁnd that the aﬃdavit did support probable cause to
search for evidence of crimes of bestiality. The unusual prob-
lem in this case is that the crime for which the aﬃdavit estab-
lished probable cause—bestiality—is not the crime for which
the typed text of the warrant authorized a search. We simply
do not know whether the issuing judge approved law en-
forcement’s handwritten alterations to the warrant before it
was executed. An evidentiary hearing is needed to ﬁgure out
what happened. It should then be possible to resolve the ques-
tions raised by those handwritten changes and Taylor’s other
challenges to the warrant.
I. Factual Background
 Taylor pled guilty to many serious crimes against children.
That said, the constitutional issues here depend less on the
details of his suspected and admitted crimes and more on the
details of the police investigation of him.
 From at least March 2011 until his arrest in April 2015,
Russell Taylor sexually exploited minor children at his resi-
dence in Indianapolis, where he lived with his wife Angela
and her two children. Taylor and Angela installed hidden
cameras throughout their house. The Taylors then produced
child pornography by surreptitiously recording numerous
children while they were fully nude, with their genitals ex-
posed, and, at times, engaged in sexual acts with Taylor and
4 No. 22-1925

other children. Taylor distributed some of this pornographic
material to others, including his employer, Jared Fogle. 1
 Indiana State Police began investigating Taylor in Septem-
ber 2014. The investigation started when Jane Doe, a woman
who had been sexually involved with both Taylor and his
wife, was texting with Taylor. Present with Doe during the
text exchange was Indiana State Police Master Trooper Patrick
Etter. Doe and Etter were apparently friends at the time, and
they sat together “laughing” and “egging it on” as Taylor sent
Doe several texts, including an image of bestiality, that oﬃc-
ers later used to apply for a search warrant.
 The government relies heavily on this text exchange from
that day:
 Doe: Any more pics I can masturbate over?
 Taylor: Lol. Tell me what you want to see. I
 got it all.
 Doe: Everything.
 Taylor: Pics or video?
 Doe: Both?
 Doe: I want that

 1 From 2009 until his arrest, Taylor was the executive director of the

Jared Foundation, a charitable organization founded by Fogle that focused
on fighting childhood obesity. In 2015 Fogle pled guilty to distributing,
receiving, and conspiring to distribute child pornography and traveling
and attempting to travel to engage in sex with a minor. United States v.
Fogle, 825 F.3d 354, 356–57 (7th Cir. 2016). The investigation of Fogle began
with the investigation of Taylor. When law enforcement searched Fogle’s
home and devices, they discovered child pornography on Fogle’s phone
that Fogle had received from Taylor. Id. at 356.
No. 22-1925 5

 Taylor: You get them
 Doe: Yeah! Can I have more?
 Doe: I love them! So hot
 Taylor: Yes What. Type? Her with dogs, orgy,
 s and m, young girls, etc
 Doe: Young orgy
 Doe: Any of you and her?
 Taylor: Yes
 Taylor: How young are you ok with
 Doe: Legal age
 Taylor: Ok
 Taylor: I wanted to ask lol. Keep in mind we
 do travel to Thailand on occasion :-)
 Although the timeline is uncertain from the current rec-
ord, at some point following this text exchange, and before
law enforcement applied for a search warrant more than six
months later, Trooper Etter and Doe became romantically in-
volved. The government asserts that their romantic relation-
ship had ended by the time the warrant aﬃdavit was pre-
pared, but there is no such evidence in the record.
 Within two days of witnessing this text exchange, Etter
contacted Kevin Getz, a detective for the Indiana State Police
who worked in the Internet Crimes Against Children Unit. On
October 3, Getz interviewed Doe at her home while Sergeant
Christopher Cecil of the Cyber Crimes Unit performed a fo-
rensic data extraction of her phone.
6 No. 22-1925

 Doe said she had met Taylor eight years earlier while she
was working at an adult club in Indianapolis. Doe and her
husband had become friends with Taylor, who often visited
the club. After Doe’s husband died in 2013, Doe responded to
a text message that Taylor sent to her husband’s phone. Doe
and Taylor talked oﬀ and on for a few months, and eventually
Doe started socializing with Taylor and his wife.
 According to Doe, once they all began socializing in per-
son, Taylor “started getting more comfortable.” He began ask-
ing about the horses Doe boarded on her property. On “ﬁve
or six occasions” Taylor expressed an interest in going over to
Doe’s “house in the middle of the night” so that his “wife
could … do something” sexual with one of the horses. Taylor
had also texted Doe a photograph that he claimed was of his
wife engaging in “some kind of sexual interaction” with a
dog. Accompanying the photo was a text from Taylor that
read: “Here’s Angie with her ex’s dog.”
 During the interview Doe also said that “someone” had
told her to stay away from Taylor because he was under in-
vestigation for drug traﬃcking. When Getz asked if Doe knew
who in law enforcement was working the case, she replied,
“I’ll run out and ﬁnd out.” As the interview transcript reveals,
Doe meant that she would ask Ron Santa, a former police de-
tective with whom Doe was intimately involved and who was
at that moment at Doe’s home. Doe retrieved Santa, and Getz
and Cecil put Doe’s interview on pause to interview him.
 Santa said he did not “know much about” Taylor. He had
met Taylor once at Doe’s home and was able to identify Tay-
lor, but Santa said he could not “remember the context” of
their prior conversation and encounter. When he had heard
No. 22-1925 7

Taylor’s name, however, Santa had associated Taylor with a
drug investigation he had been aware of before he retired.
 When the detectives resumed their interview with Doe,
Getz focused on the text exchange between Taylor and Doe
that Etter had observed a few days earlier. Taylor had referred
to Thailand, texting “Keep in mind we do travel to Thailand
on occasion.” Getz wanted to know whether Taylor had ever
actually been to Thailand. As far as Doe knew, the Taylors had
never been to Thailand, and she had never heard them say
anything about planning to go there. Although she didn’t
“know where [the Thailand reference] came from,” she sus-
pected that Taylor referred to Thailand “just … to cover up
what he said” about “young girls.”
 Getz also repeatedly asked Doe whether Taylor had ever
expressed “any interest in having sex with children.” Doe
could not recall Taylor ever indicating an interest in children.
Taylor and his wife were “just swingers.” While Doe consid-
ered Taylor to be “the type of person that seems to be very
sexually involved in whatever,” anything involving children
“was never brought up.” To be sure, Taylor “had a history of
… talking about bondage, bestiality,” and other sexual topics,
but “not about kids.” To Doe, the only “red ﬂag” was Taylor
asking if she “wanted to see a picture of him with … young
girls.”
 Finally, Getz wanted to know whether Taylor was taking
any potentially criminal photos himself or downloading them
from somewhere. Taylor had never sent Doe any photos of
“young girls,” and Doe “couldn’t tell” whether Taylor would
be “the one … taking the pictures” if they did, in fact, exist.
8 No. 22-1925

 When the detectives ﬁnished interviewing Doe, Cecil took
her phone to complete the forensic data extraction. In addi-
tion to the text exchange mentioning “young girls” and “Thai-
land,” the data extraction revealed several exchanges in
which both Taylor and his wife expressed an interest in hav-
ing sex with animals.
 Getz continued the investigation by visiting two bestiality-
oriented websites that Taylor had recommended to Doe. He
also surveilled the Taylor residence and conﬁrmed that the
two vehicles parked there were registered to Angela. He like-
wise conﬁrmed that the Taylors both received mail at that res-
idence.
 For reasons not clear from the record, Getz took no further
action for nearly four months. In late January or February
2015, he sought information about the locations for a mobile
phone number that was assigned to the Jared Foundation and
that listed Taylor as the account’s contact. In February Getz
received a week’s worth of results for that number, which
generally showed the phone in the vicinity of Taylor’s resi-
dence.
 Getz then began drafting a search warrant application. Re-
ferring to Doe as “a female friend” who had “approached”
Etter because she was “concerned” by text messages she had
received from Taylor, the warrant aﬃdavit asserted that prob-
able cause existed to search the Taylors’ residence for evi-
dence that one or more individuals residing there were en-
gaging in bestiality in violation of Indiana Code § 35-46-3-14
and possessed child pornography in violation of Indiana
Code § 35-42-4-4.
No. 22-1925 9

 While the aﬃdavit asserted that probable cause existed to
search for evidence relating to crimes of both bestiality and
child pornography, the typed search warrant itself referred
only to “evidence of possession and/or dissemination of child
pornography.” The warrant also has four handwritten altera-
tions, however. The record tells us nothing about when and
under what circumstances those alterations were made. One
added “cell phones” to the list of items to be seized. Critically,
the other three amended the scope of the search to include ev-
idence of “bestiality.” Three of the alterations were initialed
by “KLG,” whom we take to be Detective Kevin Getz. One al-
teration adding “bestiality” was not initialed at all. None of
the changes was dated, and none was signed or even initialed
by a judge.
 On April 23, 2015, Getz swore to the veracity and com-
pleteness of the warrant application before a state-court judge
who approved and issued the warrant that same day. On
April 29, law enforcement executed the warrant. The search
uncovered evidence of both possession and production of
child pornography, but no evidence of bestiality. Taylor was
arrested.
II. Procedural History
 This case has a long history. Taylor was charged in federal
court with twelve counts of sexually exploiting children and
one count of receiving, distributing, and conspiring to receive
and distribute child pornography. On December 10, 2015,
Taylor pled guilty to all counts and was sentenced to 324
months in prison.
 In late 2016, Taylor ﬁled a motion under 28 U.S.C. § 2255
challenging his convictions on several grounds, including his
10 No. 22-1925

counsel’s failure to challenge the April 2015 search warrant.
The district court granted relief in February 2020, vacating
Taylor’s guilty plea and sentence. In May 2020, Taylor was
charged in a new 34-count indictment that alleged: sexual ex-
ploitation of minors and attempted sexual exploitation of mi-
nors; coercion and enticement; receipt, distribution, and pos-
session of visual depictions of minors engaging in sexually
explicit conduct; and conspiracy to possess visual depictions
of minors engaging in sexually explicit conduct.
 This time Taylor ﬁled a motion to suppress the evidence
obtained from the searches of his residence in April 2015. He
also requested a hearing under Franks v. Delaware, 438 U.S. 154
(1978), on his claims that Getz had secured the initial search
warrant by knowingly, or with reckless disregard for the
truth, including false information in and omitting material in-
formation from the warrant aﬃdavit. Taylor also asserted that
Getz had altered the search warrant after it had been issued to
encompass evidence of bestiality.
 The district court denied both the motion to suppress and
the request for a Franks hearing. United States v. Taylor, No.
1:20-cr-00116-TWP-DML-01, 2021 WL 2417341, at *10 (S.D.
Ind. June 14, 2021). Taylor reached a conditional plea agree-
ment, pleading guilty to 30 charges but reserving his right to
appeal the denial of his motion to suppress. Taylor was again
sentenced to 324 months in prison.
 Taylor now appeals, challenging the denial of his motion
to suppress. He seeks a Franks hearing on whether Getz know-
ingly, intentionally, or with reckless disregard for the truth
included false material statements in and omitted material in-
formation from the warrant aﬃdavit. Taylor also argues that
the aﬃdavit did not support probable cause to search for
No. 22-1925 11

evidence of either child pornography or bestiality. He also ar-
gues that the court should have held a hearing on the hand-
written alterations to the warrant.
III. Analysis
 The Fourth Amendment “was the founding generation’s
response to the reviled ‘general warrants’ and ‘writs of assis-
tance’ of the colonial era, which allowed British oﬃcers to
rummage through homes in an unrestrained search for evi-
dence of criminal activity.” Riley v. California, 573 U.S. 373, 403
(2014). The Amendment guarantees that the “right of the peo-
ple to be secure in their persons, houses, papers, and eﬀects,
against unreasonable searches and seizures, shall not be vio-
lated, and no Warrants shall issue, but upon probable cause,
supported by Oath or aﬃrmation, and particularly describing
the place to be searched, and the persons or things to be
seized.” U.S. Const. amend. IV.
 At the “very core” of this guarantee “stands the right of a
man to retreat into his own home and there be free from un-
reasonable governmental intrusion.” Florida v. Jardines, 569
U.S. 1, 6 (2013), quoted in Caniglia v. Strom, 141 S. Ct. 1596,
1599 (2021). The home is deemed “so sacred” that it is pro-
tected by the Supreme Court as both a “constitutionally pro-
tected area” and an area where a person holds a “reasonable
expectation of privacy.” See Jardines, 569 U.S. at 7–8, 10–11,
quoting Entick v. Carrington, 2 Wils. K.B. 275, 291, 95 Eng. Rep.
807 (K.B. 1765). Subject to only a few speciﬁcally established
and well-delineated exceptions, the search of a home is “per
se unreasonable” unless it is conducted pursuant to a valid
warrant. Katz v. United States, 389 U.S. 347, 357 (1967). No ex-
ceptions apply in this case, so the central question posed by
12 No. 22-1925

Taylor’s motion to suppress was whether the search of his
home was authorized by a valid search warrant.
 The warrant requirement demands that law enforcement
obtain a warrant from “a neutral and disinterested magistrate
before embarking upon a search.” Franks, 438 U.S. at 164. The
magistrate “must determine independently whether there is
probable cause,” id. at 165, for it is “the magistrate’s scrutiny,”
and no one else’s, that “is intended to eliminate altogether
searches not based on probable cause.” Coolidge v. New Hamp-
shire, 403 U.S. 443, 467 (1971). Individual security against
Fourth Amendment violations would otherwise be left “only
in the discretion of the police.” Katz, 389 U.S. at 358–59, quot-
ing Beck v. Ohio, 379 U.S. 89, 97 (1964). Endowing law enforce-
ment with such discretion would circumvent “the safeguards
provided by an objective predetermination of probable
cause,” and “the protections of the Fourth Amendment would
evaporate.” See Beck, 379 U.S. at 96, 97. In short, a neutral mag-
istrate must decide probable cause before the police conduct
a search.
 But a neutral decision-maker is not enough. A magistrate’s
decision depends on the facts submitted in the warrant appli-
cation. That factual showing must be both truthful and com-
plete. Franks, 438 U.S. at 164–65 (truthful); United States v.
McMurtrey, 704 F.3d 502, 513 (7th Cir. 2013) (complete). To be
sure, truthfulness does not require that “every fact recited in
the warrant aﬃdavit is necessarily correct,” Franks, 438 U.S. at
165, nor does completeness require law enforcement to “pro-
vide every detail of an investigation.” McMurtrey, 704 F.3d at
513. But truthfulness does require that the information in the
aﬃdavit be “believed or appropriately accepted by the aﬃant
as true.” Franks, 438 U.S. at 165. Law enforcement also may
No. 22-1925 13

not “deliberately omit information the magistrate needs to as-
sess fairly the issue of probable cause.” McMurtrey, 704 F.3d
at 513.
 Taylor challenges all of these foundations for a valid war-
rant. He challenges the honesty and completeness of the un-
derlying aﬃdavit, and he questions whether the warrant itself
shows probable cause determinations made solely by a neu-
tral magistrate.
 In Part A we address Taylor’s challenges to the warrant af-
ﬁdavit, including whether probable cause would exist to
search for evidence of either child pornography or bestiality
if the aﬃdavit’s alleged inﬁrmities were corrected. We ﬁnd
that the aﬃdavit supported probable cause to search for evi-
dence of bestiality, but not for evidence of child pornography.
Even without taking the alleged inﬁrmities into account, the
aﬃdavit failed to establish probable cause for child pornogra-
phy. In Part B we then focus on the warrant itself, considering
whether this search warrant fulﬁlled the Fourth Amend-
ment’s promise that all probable-cause determinations be
made by a neutral magistrate. Given the unexplained hand-
written alterations, the record does not show that it did.
 Because probable cause existed only for bestiality and be-
cause there is no evidence that the issuing judge approved the
handwritten alterations authorizing a search for evidence of
bestiality, an evidentiary hearing is needed. Those changes to
the warrant also cannot be considered in isolation. In resolv-
ing the uncertainty surrounding the handwritten alterations,
the district court will need to consider the good-faith excep-
tion to the exclusionary rule adopted in United States v. Leon,
468 U.S. 897 (1984). Whether Detective Getz and other law en-
forcement here acted “with objective good faith,” id. at 920,
14 No. 22-1925

may implicate all law enforcement behavior, including the
false statements and material omissions Taylor has identiﬁed.
Particularly because the aﬃant who swore to the aﬃdavit’s
completeness and veracity also seems to have altered the war-
rant itself, the scope of the evidentiary hearing must encom-
pass both the aﬃdavit’s inﬁrmities and the warrant’s altera-
tions. Evaluating how false statements and omissions aﬀect
Detective Getz’s credibility and his ability to rely on Leon with
respect to the warrant itself may aﬀect whether Taylor’s mo-
tion to suppress should have been granted. In short, the dis-
trict court will need to take evidence on both the alterations
to the warrant and the aﬃdavit’s false statements and decep-
tive omissions and will need to address all constitutional con-
cerns raised by Taylor’s motion to suppress.
 A. The Aﬃdavit & Probable Cause
 An aﬃdavit supporting a search warrant is presumed
valid. United States v. Jones, 208 F.3d 603, 607 (7th Cir. 2000),
citing Franks, 438 U.S. at 171. This presumption of validity is
based on the assumption that, when law enforcement oﬃcers
make a factual showing to a neutral and detached magistrate,
it “will be a truthful showing.” Franks, 438 U.S. at 164–65, quot-
ing United States v. Halsey, 257 F. Supp. 1002, 1005 (S.D.N.Y.
1966) (emphasis in Halsey). This does not mean that every fact
in the aﬃdavit must turn out to be correct. As explained in
Franks, probable cause may be based on hearsay, and warrant
applications often must be prepared quickly. Id. at 165. But “a
search warrant is not valid if the police obtain it by deliber-
ately or recklessly presenting false, material information to
the issuing judge.” McMurtrey, 704 F.3d at 508, citing Franks,
438 U.S. at 155–56. A warrant may also be invalid if, in the
underlying aﬃdavit, the police make “a material omission”
No. 22-1925 15

that is “designed to mislead or was made in reckless disregard
of whether it would mislead” the issuing judge. Id. at 511 n.5.
 Under Franks, a defendant must ﬁrst make a substantial
preliminary showing that law enforcement knowingly and in-
tentionally, or with reckless disregard for the truth, made ei-
ther a false material statement or a material and deceptive
omission in the underlying warrant aﬃdavit. If the defendant
makes that showing, the Fourth Amendment requires an evi-
dentiary hearing on the veracity and completeness of that af-
ﬁdavit, and “ultimately on the constitutionality of the search.”
McMurtrey, 704 F.3d at 508, quoting Franks, 438 U.S. at 155–
56.
 The presumption of validity is not easy to overcome. “The
defendant must identify speciﬁc portions of the warrant aﬃ-
davit as intentional or reckless misrepresentations, and the
claim of falsity should be substantiated by the sworn state-
ments of witnesses.” Id. at 509, citing Franks, 438 U.S. at 171.
Even if the defendant meets these requirements of speciﬁcity
and support, “the defendant must also show that if the delib-
erately or recklessly false statements were omitted, or if the
deliberately or recklessly misleading omissions included,
probable cause would have been absent.” Id., citing Franks,
438 U.S. at 171–72. A defendant is entitled to a Franks hearing
only if, after removing the allegedly false statements and add-
ing the omitted information, the aﬃdavit’s “content is insuf-
ﬁcient” to support a ﬁnding of probable cause. Franks, 438
U.S. at 171–72. At that hearing, the defendant must then prove
that the false statements and/or the misleading omissions
were the result of reckless or deliberate action, not innocent
human error. United States v. Williams, 718 F.3d 644, 650 (7th
Cir. 2013) (“A showing of reckless disregard requires more
16 No. 22-1925

than a showing of negligence”). “This is a subjective inquiry
that focuses on the oﬃcer’s state of mind.” Id.
 We review a district court’s denial of a defendant’s request
for a Franks hearing for clear error. United States v. Schultz, 586
F.3d 526, 531 (7th Cir. 2009). We give deference to the district
court’s factual ﬁndings, but we review legal determinations
de novo. United States v. Harris, 464 F.3d 733, 737 (7th Cir.
2006). In this case, while not all of the questions raised by Tay-
lor’s challenge to the warrant aﬃdavit and the warrant itself
ﬁt neatly into Franks, Taylor has made such a substantial pre-
liminary showing. 2

 2 We need not decide here whether, without the unexplained altera-

tions to the warrant, Taylor would be entitled to a hearing under Franks
alone. Even accounting for the false material statements and material
omissions that Taylor has identified, the affidavit showed probable cause
to search for evidence of bestiality. While the affidavit did not support
probable cause to search for evidence of child pornography, probable
cause for at least one of the two crimes would ordinarily be sufficient to
render a Franks hearing unnecessary. Franks, 438 U.S. at 171–72. This is not,
however, an ordinary case. The affidavit’s alleged infirmities—including
the exaggerations of the information from Jane Doe and the failure to
acknowledge Doe’s intimate relationships with both the target of the in-
vestigation and with two members of law enforcement involved in the in-
vestigation—together with the fact that law enforcement altered the scope
of the warrant—all cast substantial doubt on both the affidavit and Getz’s
candor with the issuing judge. We doubt that evidence relevant to Getz’s
honesty and attention to the truth in the investigation can be cabined into
separate episodes. The record on these circumstances is limited, but we do
not think it would be prudent to limit in advance the scope of the district
court’s hearing, particularly since Franks focuses on the subjective honesty
of the warrant application. 438 U.S. at 155–56; see also United States v. Leon,
468 U.S. 897, 914 (1984) (“deference accorded to a magistrate’s finding of
probable cause does not preclude inquiry into the knowing or reckless fal-
sity of the affidavit upon which that determination was based”); United
No. 22-1925 17

 Detective Getz’s aﬃdavit began by asserting that it was
“made in support of an application for a warrant to search”
Taylor’s residence “for evidence of violations” of Indiana
Code § 35-46-3-14, which criminalizes sexual acts that consti-
tute bestiality. The statute does not criminalize the possession
or distribution of images of bestiality, but only conduct that
amounts to bestiality. The aﬃdavit sought to establish “prob-
able cause to believe that an individual or individuals lo-
cated” at the Taylors’ residence were “engaged in bestiality.”
The aﬃdavit added that law enforcement’s investigation also
concerned material involving the sexual exploitation of mi-
nors, the production, dissemination, or possession of which is
prohibited by Indiana Code § 35-42-4-4.
 All of the facts supporting probable cause to ﬁnd evidence
either that the Taylors were engaged in bestiality or that they
produced, possessed, or disseminated child pornography

States v. Woodfork, 999 F.3d 511, 518 (7th Cir. 2021), quoting United States v.
Daniels, 906 F.3d 673, 677 (7th Cir. 2018) (Franks test is subjective); United
States v. Glover, 755 F.3d 811, 820 (7th Cir. 2014); Williams, 718 F.3d at 650
(“This is a subjective inquiry that focuses on the officer’s state of mind.”);
United States v. Residence Located at 218 Third St., 805 F.2d 256, 258 (7th Cir.
1986) (explaining subjective standard and affirming factual finding that
officer did not act with reckless disregard for truth). The focus of the hear-
ing will need to be on what Getz knew about those personal relationships
when he applied for and executed the search warrant. In addition, to the
extent that Etter (and perhaps Santa) supplied relevant information to
Getz for the investigation that led to the affidavit, their candor may be
relevant as well. See United States v. McAllister, 18 F.3d 1412, 1417 (7th Cir.
1994) (under Franks, honesty of other government agents may also be rel-
evant), quoting United States v. Pritchard, 745 F.2d 1112, 1118 (7th Cir.
1984); accord, Glover, 755 F.3d at 820. On remand, the district court should
make factual findings on all relevant issues so that all factual and legal
issues can be resolved at one time.
18 No. 22-1925

were drawn from the interview with Doe, the data extraction
from her phone, and the mobile locator data provided by
AT&T. 3
 First, Getz framed how the investigation had begun: “In
September 2014, Master Trooper Patrick Etter (ISP) contacted
me regarding a possible bestiality and child pornography in-
vestigation involving a person identiﬁed as Russell C. Taylor
(Russell). Master Trooper Etter stated he had been ap-
proached by a female friend, Jane Doe.” Doe “had become
friends” with Taylor and his wife and “had received several
text messages” from Taylor “which concerned her.” The aﬃ-
davit then laid out the factual basis for probable cause.
 “Probable cause deals ‘with probabilities.’” Illinois v. Gates,
462 U.S. 213, 241 (1983), quoting Brinegar v. United States, 338
U.S. 160, 175 (1949). That is, probable cause is concerned with
“the factual and practical considerations of everyday life on
which reasonable and prudent” persons, and not “legal tech-
nicians, act.” Brinegar, 338 U.S. at 175. Probable cause is pre-
sent “when, considering the totality of the circumstances,
there is suﬃcient evidence to cause a reasonably prudent per-
son to believe that a search will uncover evidence of a crime.”
McMurtrey, 704 F.3d at 508, citing Gates, 462 U.S. at 238.

 3 Taylor challenges the affidavit’s omission of details from the mobile

locator data and the phone’s account information. We find nothing decep-
tive in the omitted details. The issuing judge could make an informed and
objective decision about probable cause without having to wade through
all of the phone data on his or her own. Even if all the omitted information
had been included, Taylor would still have been shown as associated with
the phone, and the phone would still have been placed frequently at the
Taylors’ residence.
No. 22-1925 19

 When considering an application for a warrant, the task of
the issuing judge “is simply to make a practical, common-
sense decision whether, given all the circumstances set forth
in the aﬃdavit before him, including the ‘veracity’ and ‘basis
of knowledge’ of persons supplying hearsay information,
there is a fair probability that contraband or evidence of a
crime will be found in a particular place.” Gates, 462 U.S. at
238.
 Where a district court refuses to suppress the fruits of a
search made pursuant to a warrant, our standard of appellate
review is “complex.” United States v. McIntire, 516 F.3d 576,
578 (7th Cir. 2008). The “district court’s ﬁndings of historical
fact are reviewed for clear error,” but we “give no weight” to
either the district judge’s legal conclusions or her determina-
tion that “the facts add up to probable cause.” Id., citing Or-
nelas v. United States, 517 U.S. 690, 699 (1996). Rather, when we
address whether probable cause supported a warrant, our in-
quiry is “whether the judge who issued the warrant … acted on
the basis of probable cause.” Id. (emphasis added). In short,
we are concerned less with the district court’s review than
with “the issuing judge’s conclusion that probable cause has
been established.” United States v. Sims, 551 F.3d 640, 644 (7th
Cir. 2008). We review the district court’s analysis de novo, but
we aﬀord “‘great deference’ to the issuing judge’s” ﬁnding of
probable cause. McIntire, 516 F.3d at 577–78, quoting Ornelas,
517 U.S. at 698.
 Still, like the district court before us, our task is “to ensure
that the magistrate had a ‘substantial basis’” for ﬁnding the
probable cause necessary to support the warrant. Gates, 462
U.S. at 238–39, quoting Jones v. United States, 362 U.S. 257, 271
(1960) (“substantial basis” to conclude that evidence of a
20 No. 22-1925

crime is “probably present” at the location to be searched is
suﬃcient).
 1. Probable Cause to Search for Evidence of Child Pornog-
 raphy
 For evidence relating to child pornography, the factual ba-
sis presented in the aﬃdavit came down to: (1) the text ex-
change between Taylor and Doe that Etter observed and
(2) inferences Getz drew based on his training and experience
in similar investigations. From the text exchange, Getz high-
lighted two things: Taylor’s reference to Thailand and his of-
fer to send Doe photos or videos of “young girls.” The refer-
ence to Thailand was potentially signiﬁcant because experi-
ence had taught Getz that “persons who have a sexual interest
in children have been known to travel to Thailand because it
is a hotspot for child sex tourism.” From his investigative ex-
perience, Getz asserted, rather vaguely, that “subjects en-
gaged in possession, production and dissemination of child
pornography had included a wide range of child pornogra-
phy subject matter that was not limited to: infant victims,
bondage, captured sexual activity between adults and chil-
dren, and bestiality.”
 Getz thus implied, but did not actually assert, that Taylor’s
oﬀer to send images or videos of “young girls,” in concert
with his oﬀer to send images of his wife “with dogs” and of
“s and m,” made it more likely that Taylor was involved with
child pornography. Getz made clear that Taylor had not actu-
ally sent Doe any images of “young girls.” He added: “When
asked if [Taylor] had ever expressed interest in engaging in
sexual activity with children, she responded: ‘Not that I can
remember, but he’s the type of person that seems to be very
sexually involved in whatever goes.’”
No. 22-1925 21

 As Taylor sees it, Getz’s aﬃdavit contained both false
statements and material omissions that would have inﬂu-
enced the issuing judge’s probable-cause determination on
child pornography. Correcting these inﬁrmities, Taylor ar-
gues, shows that the aﬃdavit could not support probable
cause to search for evidence of child pornography.
 First, Taylor points to Getz’s statement that Etter was “ap-
proached by a female friend, Jane Doe.” Taylor asserts that
Doe did not “approach” Etter and that she was not just a
“friend.”
 That Doe “approached” Etter certainly appears to be false.
At her interview, Doe told Getz that Etter was with her while
she texted with Taylor on September 28, 2014: “Pat [Etter] and
I were just sitting there laughing about [Taylor’s texts], all
these pictures that he was sending. So, I was kind of egging it
on.” Doe did not “approach” Etter. What’s more, there is rea-
son to believe that Getz may have known that this characteri-
zation would be, at the very least, misleading. To be sure,
when Etter ﬁrst contacted Getz, Etter may have said at ﬁrst
that he had been “approached” by Doe, but by the time Getz
swore out the aﬃdavit, Doe had told Getz otherwise. Getz
therefore falsely characterized how the investigation got
started.
 More concerning is Getz’s description of Doe as a “female
friend.” This term papered over a more complex reality that
would (or at least should) be material to an issuing judge. As
mentioned, at some point after the September 28 text ex-
change, but before Getz applied for a search warrant, Doe and
Etter became romantically involved. According to the govern-
ment, the relationship was over by the time Getz swore out
the aﬃdavit, but we have no evidence to that eﬀect. The best
22 No. 22-1925

version for the government would be that Doe and Etter were
“just friends” when Etter initially contacted Getz about Taylor
at the end of September 2014. And even if their relationship
had come to an end by the time Getz presented the aﬃdavit
to the issuing judge, that would not have somehow removed
the danger of bias in law enforcement’s investigation of Tay-
lor.
 The description of Doe as Etter’s “friend” can be seen as
either a misleading statement or a misleading omission, given
what the record discloses about the evolving nature of Doe
and Etter’s relationship. In a warrant aﬃdavit, law enforce-
ment “need not provide every detail of an investigation, nor
describe every wrong turn or dead end they pursued. But
they may not deliberately omit information the magistrate
needs to assess fairly the issue of probable cause.” McMurtrey,
704 F.3d at 513.
 First among the information omitted from this aﬃdavit
that an issuing judge would have wanted to know was Etter’s
intimate relationship with Doe. We use a “totality-of-the-cir-
cumstances approach” when assessing probable cause, and
“an informant’s ‘veracity,’ ‘reliability’ and ‘basis of
knowledge’” remain “highly relevant in determining the
value of [the informant’s] report.” Gates, 462 U.S. at 230. Re-
gardless of when this friendship evolved into more or de-
volved into less, we think it is a material omission to fail to
disclose that an oﬃcer so involved in the investigation is—or
ever has been—competing with the subject of that investiga-
tion for the informant’s aﬀections. By way of comparison, we
recognize in drug cases that judges and police must consider
the possibility that an informant may be a business rival of a
drug-dealer target. E.g., United States v. Glover, 755 F.3d 811,
No. 22-1925 23

816 (7th Cir. 2014) (“[T]he failure to establish the informant’s
reliability raise[s] the concern that the tip was provided to
harass or remove a rival.”), citing United States v. Bell, 585 F.3d
1045, 1050 (7th Cir. 2009). The same logic applies to possible
romantic and sexual rivalries and jealousies inﬂuencing the
investigation. Adding to the questions we have here is the
timing of the investigation, since nothing seems to have hap-
pened for months after Doe provided her information about
Taylor to law enforcement. We do not know what accounts for
the delay and the police priorities.
 An issuing judge would want to know about the relation-
ship between Etter and Doe. An issuing judge would also
need to know about the professional relationship between Et-
ter and Getz. It is possible that Getz knew nothing of Etter’s
romantic involvement with Doe, but whether Getz did know
might depend on how closely he interacted with Etter, both
professionally and personally.
 Likewise, an issuing judge would want to know about
Doe’s relationship with former detective Ron Santa, who was
at Doe’s home when Getz and Cecil interviewed her. The de-
tectives spent about 15 minutes interviewing Santa. Aside
from telling the detectives that, as far as he could remember,
Taylor had been connected to a drug traﬃcking investigation,
Santa provided little substantive information. But it is not the
omission of Santa’s information from the aﬃdavit that con-
cerns us. Rather, it is the omission of Santa’s participation in
Doe’s interview and the omission of Santa’s relationship with
Doe that trouble us.
 Santa was, as the government concedes, intimately in-
volved with Doe at the time of her interview with law enforce-
ment. Santa told Getz that he had met Taylor once at Doe’s
24 No. 22-1925

residence, but he could not “even remember the context of
the[ir] conversation.” Taylor casts doubt on this, claiming that
Santa had actually “confronted” Taylor at Doe’s house in the
summer of 2014. Taylor, 2021 WL 2417341, at *5.
 We ﬁnd it disturbing that Santa’s relationship with Doe
and his presence at her interview were not disclosed to the
judge who issued the warrant. That Santa, who was at least
arguably in competition with Taylor for Doe’s aﬀections, was
involved in the investigation and that his involvement might
have bolstered the detectives’ conﬁdence in Doe, are facts that
a judge considering a warrant application would want to
know. These unusual facts give this case the unwelcome ﬂa-
vor of a bad soap opera. But the judge who was supposed to
make the objective judgment about probable cause should
have been made aware of these intimate relationships and the
potentially powerful motives for the informant and law en-
forcement to slant the facts.
 We are also concerned by how Getz characterized Doe’s
information regarding Taylor’s potential interest in children.
Getz had questioned Doe repeatedly on this issue, and she
had said repeatedly that she had seen no indication of any
sexual interest in children. When asked whether Taylor was
interested in sexual activities with children, Doe initially said,
“Not that I can remember, but he’s the type of person that
seems to be very sexually involved in whatever goes.” This
much was included in the aﬃdavit.
 But Doe then explained what she meant by “whatever,”
saying that Taylor and a friend “had made a pact when they
were 16 that they could never date another girl unless the girl
was okay with sleeping with both of them.” “So,” Doe went
on, “they’re just swingers.” Later in the interview, Getz again
No. 22-1925 25

asked if Taylor had “expressed interest in wanting to do some-
thing with children,” or if “any of the text messages indicate
that he had done something?” “In other words,” Getz contin-
ued, had Taylor ever said, “yeah, my wife and I, we have done
this?” Or was it “more of, we would like to do this?” Doe said
that it “was never brought up.” Rather, it was only Taylor’s
oﬀer to send images of “young girls” that had raised a “red
ﬂag” for Doe. Still seeking clariﬁcation, Detective Cecil inter-
vened to reframe the inquiry, remarking that there was “a his-
tory of [Taylor] talking about bondage, bestiality, and all these
other things, but—.” Doe ﬁnished his sentence for him: “Not
about kids.”
 Doe had been unequivocal that children were never
“brought up” and that Taylor did not talk “about kids.” Yet
Getz included in the aﬃdavit only a fragment of Doe’s most
ambiguous response: “When asked if [Taylor] had ever ex-
pressed interest in engaging in sexual activity with children,
[Doe] responded: ‘Not that I can remember, but he’s the type
of person that seems to be very sexually involved in whatever
goes.’” As Taylor sees it, including only Doe’s (slightly mis-
quoted) initial answer and omitting her “clarifying” re-
sponses created the materially misleading impression that
Doe had suggested that Taylor was interested in children. We
agree with Taylor, at least to the extent that Taylor is entitled
to explore the issue in the hearing on remand.
 Although Getz accurately reported some of what Doe had
told him, divorcing her initial answers from context and fail-
ing to disclose Doe’s later, repeated certainty was materially
misleading. By way of analogy, imagine a witness to a bank
robbery who is asked by a police oﬃcer if the robber was
armed. At ﬁrst the witness says that he can’t remember, but
26 No. 22-1925

he imagines that the robber was the kind of person who
would always be armed. Later, the witness repeatedly tells
the same police oﬃcer that he is certain that the robber was
not armed. If the oﬃcer later testiﬁed only to the witness’s in-
itial statement and intentionally, or with reckless disregard
for the truth, omitted the later statements, his testimony
would be materially misleading.
 Finally, Taylor argues that Getz showed a reckless disre-
gard for the truth by omitting from the aﬃdavit Doe’s belief
that Taylor had never been to Thailand. In the aﬃdavit, Getz
relied on Taylor’s reference to Thailand, along with his refer-
ence to “young girls,” to draw an adverse inference that Tay-
lor might be sexually interested in children:
 “Jane Doe said” that Taylor asked “if she
 wanted to see images of ‘young girls.’ Jane Doe
 also indicated” that Taylor had sent a text mes-
 sage in which he “mentioned traveling to Thai-
 land in the past. (Based upon my training and
 investigation experience, I know persons who
 have a sexual interest in children have been
 known to travel to Thailand because it is a
 hotspot for child sex tourism.)”
Doe repeatedly told the detectives that she did not believe
Taylor had been to Thailand. Indeed, Doe suggested that Tay-
lor’s reference to Thailand was “maybe … just something to
cover up what he said” about “young girls.” Omitting Doe’s
opinions and beliefs on the Thailand question, Taylor argues,
was materially misleading since including them would have
discouraged the magistrate from accepting Getz’s adverse in-
ference.
No. 22-1925 27

 We disagree that these were material omissions. First,
while Getz’s inferences, based on his “training and investiga-
tion experience,” may be helpful to the issuing judge in as-
sessing whether it is probable that evidence of a crime will be
discovered, Jane Doe’s opinions and beliefs, based on only
hearsay and hunches, were not facts upon which probable
cause could, without more, have been found or rebutted. See
United States v. Davis, 402 F.2d 171, 174 (7th Cir. 1968) (“Even
in cases involving nonhearsay aﬃdavits, the aﬃant’s ‘mere
aﬃrmance of belief or suspicion is not enough’ to create prob-
able cause.”), quoting Nathanson v. United States, 290 U.S. 41,
47 (1933). The aﬃdavit could justiﬁably omit Doe’s opinions
and beliefs and rely solely on the fact of Taylor’s own state-
ment that he and his wife “travel to Thailand on occasion.”
Excluding Doe’s opinions and beliefs on the Thailand issue
was not a material omission.
 In sum, we agree with Taylor that Getz falsely character-
ized Doe as a “female friend” who “approached” law enforce-
ment and created a materially misleading picture by omitting
any reference to Doe’s intimate relationships with Etter and
Santa. The aﬃdavit’s selective quoting with regard to Taylor’s
potential interest in children was also misleading. In other
words, Taylor has met his burdens of speciﬁcity and support
and made the substantial preliminary showing required un-
der Franks. McMurtrey, 704 F.3d at 509, citing Franks, 438 U.S.
at 171.
 Ordinarily, once the defendant has met these burdens, we
would ask whether, “if the deliberately or recklessly false
statements were omitted, or if the deliberately or recklessly
misleading omissions included, probable cause would have
been absent.” Id., citing Franks, 438 U.S. at 171–72. But in this
28 No. 22-1925

case, that inquiry is frankly unnecessary. Even without ad-
justing the aﬃdavit’s content to remove false statements and
correct the omissions, the aﬃdavit did not support probable
cause to search for evidence of child pornography.
 As the aﬃdavit stood when it was presented to the issuing
judge, factual support for probable cause to ﬁnd evidence of
child pornography essentially came down to: (1) Taylor’s
vague oﬀer to send Doe images of “young girls”; (2) Taylor’s
reference to Thailand; and (3) Detective Getz’s claim that his
training and experience connected child pornography to both
Thailand and bestiality. This is an exceedingly thin basis on
which to ﬁnd probable cause and then launch something as
intrusive as a thorough search of a home for evidence of child
pornography. Far from constituting suﬃcient facts to infer
that Taylor was involved with child pornography or the ex-
ploitation of children, these references to “young girls” and
Thailand did not reasonably support an inference of criminal-
ity. “Young” is a relative term, and while a few people who
travel to Thailand intend to criminally exploit children, sup-
posedly having been a tourist in Thailand adds little basis for
believing that an individual tourist is a criminal—at least not
without some signiﬁcant corroboration of criminal wrongdo-
ing.
 We have often found probable cause lacking on more sub-
stantial facts. E.g., Bell, 585 F.3d at 1050 (aﬃdavit did not es-
tablish probable cause where informant claimed there were
“plastic baggies” with crack cocaine and a gun at a residence
but provided “no indication of the amount of crack cocaine”
or how the informant could identify it, and no recent infor-
mation on location of ﬁrearm); United States v. Peck, 317 F.3d
754, 756 (7th Cir. 2003) (no probable cause where only details
No. 22-1925 29

informant gave were that she had been in the house and was
shown drugs); United States v. Koerth, 312 F.3d 862, 867 (7th
Cir. 2002) (aﬃdavit lacked adequate factual foundation where
previously unknown informant testiﬁed that he had observed
“approximately 150–200 pounds of marijuana …, two pounds
of methamphetamine, a large bag of cocaine, and $30,000 in
U.S. currency,” as well as “fully automatic weapons” at de-
fendant’s residence).
 Once we adjust for the false statements and omissions,
there is even more reason to doubt that an issuing judge could
discern a “substantial basis” for probable cause with respect
to child pornography. The judge would have had no aﬃrma-
tive evidence of child pornography, and also would have
learned of Doe’s repeated assertions that Taylor had never ex-
pressed a sexual interest in children and the intimate quad-
rangle among Taylor, Doe, Santa, and Etter. Those relation-
ships raise a substantial risk of bias. Two members of law en-
forcement involved in the investigation were potentially com-
peting with the target of that investigation for the key inform-
ant’s intimate favors. One introduced his “friend” to the oﬃc-
ers who specialized in child exploitation crimes. The other
was present during Doe’s interview with those oﬃcers. These
facts draw into question the veracity and reliability of Doe,
Santa, and Etter. See Glover, 755 F.3d at 818 (“When an aﬃda-
vit presents a close question as to probable cause …, any avail-
able credibility information is likely to be material to the mag-
istrate’s decision.”). If an issuing judge were aware of the
“complicated” relationships at play in this case, it could only
diminish a basis for probable cause that was already paper-
thin.
30 No. 22-1925

 Still, the government argues that Taylor’s references to
“young girls” and Thailand, the presence of children at the
Taylors’ home, and Getz’s training and experience were suﬃ-
cient to sustain the warrant. It should go without saying that
the mere presence of children in a home should not raise any
red ﬂags. All there is to support probable cause is a reference
to “young girls,” a reference to Thailand, and the fact that Tay-
lor had sent Doe an image of bestiality, which Getz implied,
but did not try to assert under oath, might indicate an indi-
vidual’s interest in child pornography. (And if what Getz said
on the subject had any possible correlation, it was running the
wrong direction. Although the key sentence was missing a
critical verb, he implied that people involved with child por-
nography sometimes possessed images of bestiality, but not
vice versa.)
 Courts have often found probable cause wanting on a
more substantial basis. We simply cannot ﬁnd probable cause
for child pornography on these thin and ambiguous facts. By
analogy, imagine that drug investigators see a text that reads,
“If you’re looking to score, I might be able to help you. Keep
in mind that I travel to Amsterdam on occasion.” For probable
cause and the Warrant Clause to have any meaning, substan-
tially more is needed to issue a warrant.
 2. Probable Cause to Search for Evidence of Bestiality
 With respect to bestiality, the factual basis laid out in the
aﬃdavit was more substantial. Getz noted that Doe boarded
“four horses on her property” and that Taylor had repeatedly
asked Doe if he and his wife could come over to “engage in
sexual activity with a horse.” Text messages from both Taylor
and his wife to Doe corroborated Doe’s account of the Taylors’
No. 22-1925 31

interest in bestiality. In those texts, Taylor himself had sug-
gested sex with both horses and dogs.
 Most important, Taylor had texted Doe a photo of “a dog
licking the nude genitalia of a woman.” The woman’s face
was not visible in the photo. On its own, sending an image of
bestiality would not violate the Indiana Code, but the aﬃda-
vit oﬀered two reasons for Doe’s belief that the woman de-
picted in the photo was Angela Taylor, and that would mean
that at least one of the Taylors had actually engaged in besti-
ality, albeit without knowing the time or location. First, the
aﬃdavit pointed out, Taylor himself claimed that it was An-
gela in the photo. A text message accompanying the photo
read: “Here’s Angie with her ex’s dog.” Second, Getz asserted
in the aﬃdavit that Doe had said that “she had previously ob-
served” Angela’s body and could identify Angela by distinc-
tive physical characteristics. Doe’s description of Angela’s
physical features aligned with those of the woman in the
photo. The ﬁrst reason was suﬃcient to support probable
cause, but Taylor has made at least a preliminary showing that
the second reason was baseless.
 Taylor’s own text message to Doe said that it was his wife
in the incriminating photo. But there is no evidence that Doe
told the investigators that she claimed either to have seen An-
gela’s body or to be able to identify her. The transcript of
Doe’s interview indicates that she thought Angela was the
woman in the photo only because it said so “right on the text
message.” Perhaps Doe told the detectives that she could
identify Angela’s body at another time or oﬀ the record dur-
ing her interview, but nothing in this record supports the af-
ﬁdavit’s claim. While we are not yet willing to say, as Taylor
32 No. 22-1925

argues, that Getz “manufactured” this statement, it nonethe-
less appears to be false.
 Along with the other false statements and omissions dis-
cussed above, this possible attempt to corroborate Taylor’s
own identiﬁcation of his wife with a seemingly false state-
ment is troubling, to say the least. The attempt is all the more
jarring because it was not necessary. Both law enforcement
and the issuing judge were entitled to credit Taylor’s state-
ment incriminating his wife. See United States v. Harris, 403
U.S. 573, 583 (1971) (“Admissions of crime, like admissions
against proprietary interests, carry their own indicia of credi-
bility—suﬃcient at least to support a ﬁnding of probable
cause to search.”). That Taylor said that it was Angela in the
photo was enough. There was no need to corroborate his
claim with additional evidence, whether true or false. 4
 To be sure, understanding that a love quadrangle poten-
tially existed among Taylor, Doe, Etter, and Santa, a neutral
magistrate might discount Doe’s statements about how av-
idly the Taylors had expressed an interest in bestiality. But
even if we disregarded the entire interview with Doe, we
would still have the image of bestiality that Taylor sent to Doe
and Taylor’s accompanying text claiming that it was his wife
in the photo. That text message, on its own, was suﬃcient.
Even accounting for arguably false statements and mislead-
ing omissions, the aﬃdavit provided a substantial basis for
concluding that a search was reasonably likely to turn up ev-
idence of bestiality.

 4 As things turned out, law enforcement later discovered that the

photo was not of Angela Taylor but was instead a photo that had been
circulating for a while in the darker corners of the internet.
No. 22-1925 33

 If this were the end of the inquiry, there might be no need
for a Franks hearing. Probable cause to search for evidence of
bestiality could have permitted the search, and any failure of
probable cause for child pornography might have been harm-
less on the theory that child pornography would probably
have been discovered in a search for evidence of bestiality.
But we also have the problem posed by the alterations to the
warrant itself. As we explain next, the warrant itself demands
a hearing, and the aﬃant’s credibility is called into question
by the problems that the aﬃdavit and warrant present when
considered together.
 B. The Search Warrant
 We have never before encountered a search warrant that
had handwritten alterations that were not at least initialed by
a judge. The parties have not identiﬁed, and we have not
found, any case where a court has upheld a search warrant
that contained such unexplained alterations.
 “General warrants do not satisfy the requirement of the
Fourth Amendment that the warrant contain a description of
the place to be searched and the persons or things to be seized.
This particularity requirement protects persons against the
government’s indiscriminate rummaging through their prop-
erty.” United States v. Jones, 54 F.3d 1285, 1289–90 (7th Cir.
1995), citing Dalia v. United States, 441 U.S. 238, 255 (1979), and
Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The re-
quirement of particularity should prevent general searches.
“By limiting the authorization to search to the speciﬁc areas
and things for which there is probable cause to search, the re-
quirement ensures that the search will be carefully tailored to
its justiﬁcations, and will not take on the character of the
wide-ranging exploratory searches the Framers intended to
34 No. 22-1925

prohibit.” Maryland v. Garrison, 480 U.S. 79, 84 (1987). In other
words, the requirement of particularity “ensures that the
scope of a search will be conﬁned to evidence relating to a spe-
ciﬁc crime that is supported by probable cause.” United States
v. Vitek Supply Corp., 144 F.3d 476, 481 (7th Cir. 1998) (empha-
sis added).
 Here, we have a typed warrant—signed by the issuing
judge and ﬁle-stamped by the issuing court—that authorized
the search for and seizure of evidence relating to the speciﬁc
crimes of “possession and/or distribution of child pornogra-
phy.” The warrant satisﬁed the particularity requirement for
searching for evidence of child pornography, but that basis
for the warrant was not supported by probable cause. As for
evidence of bestiality, the warrant was supported by probable
cause but did not satisfy the particularity requirement. In-
stead, we have only handwritten additions to the warrant,
made by law enforcement, that purport to authorize a search
for evidence of “bestiality.” This is a problem.
 Handwritten alterations are not necessarily fatal to the va-
lidity of a warrant. Other courts have upheld warrants where
a judge agreed to the handwritten changes. For example, in
United States v. Waker, 534 F.3d 168, 169–70 (2d Cir. 2008), the
Second Circuit aﬃrmed denial of a motion to suppress where
the “search warrant form did not include a list of the items to
be seized, but it did cross-reference the attached aﬃdavit”
and the issuing magistrate had “initialed the section of the af-
ﬁdavit that listed the items to be seized.” In United States v.
Hill, 500 F.2d 315, 316, 320, 323 (5th Cir. 1974), the Fifth Circuit
likewise aﬃrmed denial of a motion to suppress where law
enforcement had given “oral testimony before the issuing
magistrate … to bolster an otherwise deﬁcient aﬃdavit,” and
No. 22-1925 35

the magistrate had then initialed a “handwritten notation on
the aﬃdavit” to the eﬀect that the additional information sup-
ported the warrant. See also United States v. Mendez-Sanchez,
563 F.3d 935, 941 (9th Cir. 2009) (noting that district judge had
upheld warrant where service date had been crossed out and
changed, and it was apparent that “the magistrate judge had
just accidentally begun to write” the wrong date but “had in-
itialed his mistake”); United States v. Johnson, No. 06-CR-
6134L, 2007 WL 542125, at *1, *5 & n.6 (W.D.N.Y. Feb. 16, 2007)
(denying motion to suppress; warrant adequately stated with
particularity the place to be searched where both warrant and
application included “handwritten notation, initialed by the
aﬃant and the issuing judge,” that narrowed scope of search);
United States v. Alexander, No. 2:04-CR-71, 2005 WL 8145754,
at *1, *3–4 (N.D. Ind. Feb. 9, 2005) (denying motion to dismiss
indictment where defendant claimed law enforcement had
falsiﬁed date on search warrant, but government was able to
provide adequate explanation, namely that magistrate judge
had “changed the date on the search warrant by hand and in-
itialed the change on the document”); United States v. Werber,
No. 90 Cr. 364 (LMM), 1991 WL 173158, at *4–5 (S.D.N.Y. Aug.
27, 1991) (denying motion to suppress where supporting aﬃ-
davit’s service date was incorrect as typed but issuing judge
had corrected it and initialed the change); United States v. Gio-
vanelli, 747 F. Supp. 891, 895, 897 (S.D.N.Y. June 7, 1989) (deny-
ing motion to suppress where service date had been changed
but issuing magistrate had initialed change); State v. Norwood,
279 S.E.2d 550, 553 (N.C. 1981) (issuing magistrate changed
date on both warrant and aﬃdavit and initialed changes);
State v. Gosch, 339 P.3d 1207, 1211, 1213 (Idaho App. 2014) (im-
plicitly approving handwritten alteration to warrant initialed
by magistrate).
36 No. 22-1925

 Going a little further out on the legal limb, a few cases have
held that the issuing judge herself need not make the physical
alteration if the judge approves the change before the warrant
is executed. See United States v. Payne, 341 F.3d 393, 398, 404
(5th Cir. 2003) (aﬃrming denial of motion to suppress where
law enforcement “handwrote [an] additional allegation, as
well as a correction of [the defendant’s] address, on the aﬃ-
davit,” and “then presented it to the magistrate, who initialed
the handwritten material to validate its inclusion in the aﬃ-
davit”).
 The most lenient case we have found is United States v. Are-
nal, 768 F.2d 263, 267 (8th Cir. 1985), where the Eighth Circuit
upheld warrants where a judge approved alterations before
the warrants were executed but initialed the handwritten
changes only after the warrants were executed. In that case,
an oﬃcer noticed that one address of an apartment to be
searched had been typed correctly in some places but mistak-
enly in others. The oﬃcer called a state judge who told him to
make the necessary corrections and to execute the warrants.
The oﬃcer made the changes and initialed them, and the
judge later initialed the corrections as well. The federal dis-
trict court and Eighth Circuit found no reason to suppress the
evidence seized in the search, for the oﬃcer was entitled to
rely on the judge’s assurance that he had authority to carry
out the searches.
 Given the current state of this record, the government is
asking us to go into unknown territory. We know that the is-
suing judge found probable cause to search for evidence of
child pornography, but we have no evidence—no signature
or initials—that the judge found probable cause to search for
evidence of bestiality. The government asserts that the issuing
No. 22-1925 37

judge requested the changes and that Detective Getz made the
changes in the judge’s presence before the warrant was
signed. That seems like an odd way to have handled the prob-
lem, and the government presents no evidence in support. We
cannot safeguard the Fourth Amendment by merely accept-
ing the government’s word on such a critical point unsup-
ported by the record.
 That is not to say, however, that we should hold this war-
rant invalid in this appeal. Where objective evidence of the
issuing judge’s approval is wanting, the remedy is not neces-
sarily to invalidate the warrant. Rather, when other courts
have been confronted with unexplained alterations to war-
rants, they have held hearings on the circumstances. See
United States v. Blake, No. CR205-48, 2006 WL 3933681, at *1,
*3 (S.D. Ga. Sept. 7, 2006) (adopting magistrate’s recommen-
dation to deny defendant’s motion to suppress where “hand-
written language on the face of the search warrant … was not
initialed” by the issuing magistrate but “uncontradicted evi-
dence” showed that handwritten language on warrant was
added in front of the issuing judge and at his request); Battle
v. State, 597 S.E.2d 417, 418–19 (Ga. App. 2004) (aﬃrming de-
nial of motion to suppress where trial court had found that,
among competing aﬃdavits, a four-page aﬃdavit had been
properly submitted to the issuing magistrate even though that
magistrate could not recall which aﬃdavit had been pre-
sented to her and testiﬁed that “she had never seen an aﬃda-
vit as long as four pages,” but only the four-page aﬃdavit was
initialed by issuing judge and certiﬁed by the clerk of the
magistrate court); Barnes v. State, 876 S.W.2d 316, 327–28 (Tex.
Crim. App. 1994) (en banc) (aﬃrming denial of motion to sup-
press evidence obtained pursuant to warrant that failed ex-
pressly to incorporate underlying aﬃdavit’s appendices
38 No. 22-1925

where testimony adduced at a hearing revealed that issuing
magistrate had suggested and made handwritten changes to
appendices before he signed the warrant and both magistrate
and aﬃant had initialed those changes).
 The proper resolution of this appeal is clear. Where a war-
rant has material handwritten alterations that have not been
signed or initialed by the issuing judge, the warrant’s validity
is called into doubt. When confronted with such a facially
questionable warrant, a court should hold an evidentiary
hearing to determine whether the issuing judge had approved
those changes, and if so, when and how. The particularity re-
quirement cannot be satisﬁed so long as questions surround-
ing material alterations to a warrant remain unanswered.
 Such a hearing may not always be necessary, such as
where unexplained alterations are obviously immaterial or
perhaps if the contents and circumstances make a benign ex-
planation obvious. In this case, however, a hearing is neces-
sary. The aﬃdavit supported probable cause for bestiality,
but not for child pornography, while the typed and signed
warrant was facially valid for child pornography, but not for
bestiality. In other words, the constitutionality of this search
can be based only on probable cause to search for evidence of
bestiality.
 Conclusion
 An evidentiary hearing is needed to determine whether
the issuing judge approved the alterations to the warrant
prior to its execution. Questions surrounding those altera-
tions will be relevant to the Leon good-faith exception to the
exclusionary rule, so that hearing must also encompass false
statements and material omissions in the underlying aﬃdavit
No. 22-1925 39

and law enforcement’s subjective good faith in seeking the
search warrant. Whether the evidence at that hearing can cure
the warrant’s constitutional problems is a question for the dis-
trict court to address after ﬁnding the necessary material facts.
We express no view on that question at this time.
 The judgment of the district court is VACATED and the
case is REMANDED for proceedings consistent with this
opinion.