In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-2617

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAMONT COLEMAN,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:18-cr-00101-TLS-JEM-1 — **Jon E. DeGuilio**, *Judge.*

———————————

ARGUED SEPTEMBER 4, 2024 — DECIDED MAY 15, 2025

———————————

Before ROVNER, BRENNAN, and LEE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Suspicious of drug activity, investigators sent confidential informants and undercover officers to make at least fourteen controlled purchases of heroin at an apartment building in Gary, Indiana, owned by Lamont Coleman. Officers used evidence from those buys, along with evidence they collected from a surveillance van they placed outside of the building, to secure a warrant to search Coleman's apartment and a house he owned next door. That warrant

turned up drugs, money, and firearms which the government used at Coleman's trial to convict him on most, but not all, of the counts of the indictment. Coleman presents four claims on appeal. First, he alleges that the court constructively and unconstitutionally amended his indictment by issuing generic jury instructions despite a very specific indictment. Second, he accuses the government of withholding, until sentencing, information which, he argues, would have proven the falsity of key allegations in the warrant. Third, he claims that the sentencing court impermissibly refused to accept an affidavit as evidence of mitigating circumstances. And fourth, he argues that the district court erred when it considered acquitted conduct at sentencing. We affirm on all grounds.

## I.

From November 2017, through August 2018, agents sent confidential informants and undercover officers to buy drugs from Coleman's suspected heroin operation. Coleman lived with his then-girlfriend, Katrina "Trina" Owens, in a two-story apartment building he owned on a corner lot at 4104 Madison Street in Gary. That apartment building shared a driveway and side yard with an unoccupied house to the south, at 4120 Madison Street, which Coleman also owned.

The configuration of the house and the apartment building on the property took on importance during the warrant request as investigators needed to connect the drug activity happening generally in the apartment building to Coleman specifically. Coleman and Owens mostly used the south door of the small two-story apartment building at 4104 which led out to a driveway shared with Coleman's house next door at 4120. Augustine Pike, Tony Petty, and Coleman's uncle, Leroy Coleman (hereinafter "Leroy"), also lived in the

apartment building and acted as drug runners. They used the building's door on the east side of the building which faced the sidewalk and street. From this, investigators surmised that the south door led directly into Coleman and Owens's apartment, and the east door served as a common door to the remaining apartments.

Investigators observed several controlled purchases, either by confidential sources or undercover officers. These purchases followed one of several patterns. The confidential source would call a phone number ending in 5944, answered either by "KD" or "Trina." "KD" was a name that Coleman used on social media and which law enforcement databases tied to Coleman. A few moments later, someone would come from the public entrance of the building, deliver the drugs, and then retreat into the apartment building's public entrance. Often, just before the drug runner would exit the apartment door, Coleman or Owens would leave through the south door (their apartment), go briefly to the house, and then return through the south door. Runners delivered most of the drugs on the corner directly outside of the apartment building, but sometimes they would deliver the drugs in front of 318 or 321 West 41st street, two houses east of the apartment building. Occasionally Trina would direct callers to a location a little farther away.

Law enforcement officers were involved in one way or another with approximately fourteen of these controlled purchases. We summarize the controlled buys that were included in the warrant request affidavit in the following table:

| Date | Purchaser | Arranged buy with | Delivered by |
|---|---|---|---|
| 11-6-17 | Confidential Source 1 | Leroy | Leroy |
| 11-13-17 | Confidential Source 1 | Leroy | Leroy |
| 11-16-17 | Confidential Source 1 | Leroy | Leroy |
| 11-27-17 | Confidential Source 1 | Leroy | Leroy |
| 1-18-18 | Confidential Source 2 | KD | "Black female" |
| 1-25-18 | Confidential Source 2 | Trina | "older Black male" |
| 1-29-18 | Confidential Source 2 | Trina | "older Black male" |
| 2-6-18 | Confidential Source 1 | KD | Pike & Petty |
| 2-8-18 | Confidential Source 2 | KD | Petty |
| 2-19-18 | Undercover Officer | KD | Pike |
| 3-13-18 | Undercover Officer | Trina | Pike |
| 4-19-18 | Confidential Source 3 | Trina | Pike |
| 5-10-18 | Undercover Officer | Trina | Pike |
| 8-14-18 | Undercover Officer | Likely Trina | Pike |

In addition to these controlled buys, investigators also witnessed other drug deals not involving police-controlled purchasers. For example, just before the August 14 controlled purchase, investigators watched Coleman, Pike, and Petty leave the apartment together, travel several miles to another location where Pike and Petty delivered heroin to other individuals before selling more heroin to the undercover officer.

In late June, investigators placed a surveillance van in front of the properties. For five days, the surveillance van recorded the drug runners coming and going from the east door of the apartment building. It also recorded Owens and Coleman leaving their apartment, going to Coleman's vacant house across the driveway for a few minutes, and then returning to their apartment, just before a drug runner left the front door of the apartment building to sell drugs. At some unknown point in time, the video recordings were spoiled during a transfer from one format to another and became unusable.

After collecting the information from the controlled buys and surveillance, on August 23, 2018, David Murray, a task force officer with the Drug Enforcement Administration, submitted an affidavit in support of a search warrant to a magistrate judge detailing the information the investigators had gathered.

Officers executed the warrant on August 28, 2018, during which time they found a Glock handgun under the mattress on which Coleman and Owens were sleeping, a Ruger handgun in the filing cabinet in a room of the apartment that appeared to be used as an office, around 9 grams of cocaine, and 11.5 grams of heroin. At the house next door, they found a .40-caliber, Hi-Point handgun and a safe, for which Coleman had the code, containing $19,000 in cash.

The grand jury indicted Coleman and charged him with conspiring to distribute heroin, two counts of distributing heroin, possessing heroin with intent to distribute, possessing cocaine base with intent to distribute, and being a felon unlawfully in possession of a firearm, "which was a Glock" with "serial number NLW237." R. 146, 299. The specificity of the

description of the weapon in the indictment is one of the main focuses of Coleman's appeal.

Along with Coleman, the government charged Owens, Leroy, Pike, and Petty, and all pled guilty. As will become relevant later, Leroy's plea agreement stated that he was a minor participant, and he was sentenced accordingly.

Prior to trial, Coleman moved to suppress the evidence from the search warrant, arguing that the warrant lacked sufficient evidence of his participation and of probable cause to search his specific apartment. The court held a *Franks* hearing during which Officer Murray testified about Coleman's comings and goings connecting his apartment to the deals.[1] In declining to suppress the evidence, the court, summarizing the facts, noted that a surveillance van was placed near Coleman's residence and "recordings show" numerous "times, either Mr. Coleman or Ms. Owens … briefly enter the unoccupied house next door," and return to the south door shortly before the drug deals. R. 278 at 3. The court also noted that investigators had observed "several controlled purchases with the same pattern of activity." *Id.* Coleman did not challenge the judge's reference to the recordings during this *Franks* hearing or at trial. For the first time on appeal, however, Coleman raises the issue of whether the recordings existed or not, claiming that Officer Murray's testimony at sentencing about their spoliation was new information entitling him to a new trial, or, at the least, a new *Franks* hearing.

---

[1] A *Franks* hearing is used to challenge the validity of a search warrant affidavit based on allegations that it contains false statements or omissions. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978).

At trial, the government presented evidence found pursuant to the execution of the warrant, including the firearms and drugs. The jury heard about the controlled buys, including audio of some of the phone calls in which "KD" answered the phone, and testimony from law enforcement officers identifying the voice as belonging to Coleman. They saw video of Pike, from one of the informant's vehicles, completing drug deals, and heard a stipulation that the Glock handgun travelled in interstate commerce. Owens testified about Coleman's role as the leader of the conspiracy. Detective Slatton testified briefly about the surveillance van that investigators parked in front of the property for several days, and he included a brief description of what the surveilling officers observed, but he also stated that something went wrong with the video that investigators intended to record from the van.[2] The jury also heard from experts about the connections between weapons, large quantities of cash, and drug dealing. The judge sent the jury to deliberate with the indictment and the unopposed jury instructions.

The jury found Coleman guilty of being a felon unlawfully in possession of a firearm, as well as of conspiring and possessing with the intent to distribute heroin. It acquitted him of the January 18 and February 19 drug deals, and of possessing cocaine base with the intent to distribute.

Prior to sentencing Coleman objected to several enhancements, but only three are relevant to this appeal: his role as a

---

[2] Detective Slatton testified that the van was parked outside of Coleman's residence for "[t]hree days, I believe." R. 336 at 105, Tr. 105. The warrant application attested that the surveillance van had been parked in front of the property for five days. The amount of time that the van recorded is not relevant to our resolution of the case.

leader, obstruction of justice by attempting to intimidate and influence a witness, and the inclusion of acquitted conduct in the calculation of his sentence. The court held a hearing to allow the parties to present additional evidence relevant to Coleman's objections. To address the first two of these enhancements, Coleman introduced a handwritten notarized statement from Leroy dated July 31, 2021, just prior to his original sentencing date of August 12, 2021 (sentencing was later extended to March 10, 2022). In the document, Leroy declared that he, not Coleman, was the leader of the operation. Coleman's counsel informed the court that Coleman gave him the affidavit, but he knew nothing else about its origin. Neither Coleman nor the government chose to call Leroy. Although the court marked the exhibit, it ultimately declared that it was insufficiently reliable for admission and consideration.

On the government's side, to support the leadership enhancement, Officer Murray testified to the role Coleman played in the operations. During cross examination, Murray confirmed that law enforcement investigators recorded activity from the surveillance van but noted that the recordings had been lost while being run through a software program and uploaded to a cloud-like system.

The court issued an order addressing Coleman's objections to the presentence report, overruling Coleman's objections and finding sufficient evidence of Coleman's role as a leader, and of his efforts to influence Leroy's testimony. Shortly after that order issued, but before the actual sentencing judgment, Coleman's defense counsel withdrew, and his newly appointed counsel filed a motion for a new trial based on the revelation of allegedly new information—Officer

Murray's sentencing hearing testimony about the unviewable surveillance recordings. Coleman also alleged that the government failed to divulge the lack of recordings in violation of the requirement in *Brady v. Maryland* that the government disclose all exculpatory evidence. 373 U.S. 83, 87 (1963). At a minimum, new counsel argued, Coleman was entitled to a second *Franks* hearing to flesh out the facts. The court, however, disagreed. It interpreted Murray's testimony to mean that indeed there had been recordings from the van surveillance, but that those recordings were rendered useless only while being uploaded. The court also concluded that investigators had real time access to the video feed from the surveillance van and had also observed other activities firsthand, without the use of recording equipment. Moreover, the court noted, the jury had already been told that there were technical problems with the videos and therefore Murray's testimony would not have added more. The court found no inconsistencies between this interpretation of the facts and the statements in the search warrant. In any event, the court noted, the affidavit also contained the independent observations of the investigating officers and other information that established probable cause even without the paragraph in question. Finally, the district court concluded, none of the allegedly new evidence would have altered either the court's holding on the motion to suppress or the outcome at trial. The district court judge rejected the *Brady* claim for the same reasons—the trial evidence would have been the same and there was no reasonable probability that the result of the trial would have been different.

Having resolved the objections, the court sentenced Coleman to a below-guidelines sentence of 240 months. He now appeals, arguing that the proceedings were tainted by a

constructive amendment, the government's withholding of information, the court's refusal to allow into evidence an affidavit, and the use of acquitted conduct at sentencing.

## II.

### A. Constructive Amendment.

The Fifth Amendment ensures that defendants are given reasonable notice of the allegations against them and an opportunity to prepare a defense. *United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019), *cert. granted, judgment vacated on other grounds*, 140 S. Ct. 1291 (2020). The words of the amendment—"[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury"—have been interpreted to mean that "[o]nly the grand jury can broaden an indictment through amendment; neither the government nor the court may do so." *Pierson*, 925 F.3d at 919 (citing *Stirone v. United States*, 361 U.S. 212, 215–16 (1960) and U.S. Const. amend. V). "[W]hen the proof offered at trial, the jury instructions, or both allow the jury to convict for an offense outside the scope of the indictment" we say that the indictment has been "constructively amended." *Id.* at 919–20.

In this case, Coleman claims that the jury instructions, in combination with the evidence presented at trial, impermissibly broadened the narrow indictment which charged Coleman with being a felon in possession of "a Glock … with serial number NLW237." R. 146 at 8. Coleman argues that despite this narrow charge, the jury instructions allowed jurors to convict if he possessed either of the two other firearms about which the government presented evidence at trial—the Hi-Point and Ruger.

The jury instruction stated:

> **Count 4 of the indictment** charges the defendant with unlawfully possessing a firearm on or about August 28, 2018. In order for you to find the defendant guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> 1. The defendant knowingly possessed a firearm; and
>
> 2. At the time of the possession, the defendant had previously been convicted of a crime punishable by imprisonment for a term exceeding one year; and
>
> 3. At the time of the possession, the defendant knew he had been convicted of a crime punishable by imprisonment for more than one year; and
>
> 4. The defendant's possession of the firearm was in or affecting commerce.

R. 315 at 24. In contrast, the final superseding indictment alleged that Coleman violated 18 U.S.C. § 922(g) when he "possessed a firearm, which was a Glock model 19c firearm bearing a serial number NLW237." R. 146 at 8.

"Specific language in an indictment that provides detail beyond the general elements of the crime makes the specified detail essential to the charged crime and must, therefore, be proven beyond a reasonable doubt." *Pierson*, 925 F.3d at 920. In other words, the indictment did not have to include the make and serial number of the firearm, but because it did, the

jury had to find, beyond a reasonable doubt, that Coleman possessed a Glock with serial number NLW237. Proof of his possession of another weapon would not suffice for a finding of guilt on the felon-in-possession charge.

To assess Coleman's claim of constructive amendment, we must determine whether his argument was forfeited or waived, and if not waived, whether he can demonstrate the elements of plain error, particularly the prejudice prong.

### 1. Forfeiture or waiver?

Coleman did not object to the jury instruction at trial. We therefore must decide if he intentionally relinquished this known right, waiving it in the district court or inadvertently failed to raise it, thus forfeiting it. *See United States v. Patlan*, 31 F.4th 552, 558 (7th Cir. 2022). Forfeited arguments may be reviewed on appeal, but only for plain error. *United States v. Carr*, 107 F.4th 636, 647 (7th Cir. 2024). Waiver, on the other hand, removes all contest about the matter and precludes any appeal. *United States v. Robinson*, 964 F.3d 632, 639–40 (7th Cir. 2020). Nothing here points to the type of strategic and knowing relinquishment that we look for as the hallmark of waiver. *Id.* at 641–42. We cannot surmise any reason why Coleman would not have lodged his constructive amendment argument in the district court had his counsel considered that possibility. And indeed, we commonly find forfeiture and not waiver in cases where a defendant fails to object to jury instructions in the district court and then argues constructive amendment on appeal. *See United States v. Withers*, 960 F.3d 922, 930 (7th Cir. 2020); *Pierson*, 925 F.3d at 919. Our case law is in some tension, but predominately we have held that a blanket "no objection" to jury instructions, like Coleman's counsel's statement here, results in forfeiture and not waiver.

*See United States v. Leal*, 72 F.4th 262, 266 (7th Cir. 2023) (recounting tension, but pointing to only one case, *United States v. Bell*, 28 F.4th 757, 763 (7th Cir. 2022), as an example of this court finding waiver); *cf. United States v. Hyatt*, 28 F.4th 776, 782 (7th Cir. 2022) ("A mere failure to object to part of a PSR is not enough to support a finding of waiver. … the waiver principle is construed liberally in favor of the defendant."). We find that Coleman forfeited his constructive amendment claim.

### 2. Plain error review.

We therefore review Coleman's forfeited constructive amendment claim for plain error only. That is, we ask (1) did the district court err, (2) was the error plain, (3) did it affect Coleman's substantial rights, and (4) did it seriously affect the fairness, integrity, or public reputation of the proceedings? *United States v. Marcus*, 560 U.S. 258, 262 (2010); *Pierson*, 925 F.3d at 919.

We begin with the third criterion which requires that the "error must be 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial." *Marcus*, 560 U.S. at 262. Under our circuit law, "[i]n the context of plain error review, the [constructive] amendment must constitute 'a mistake so serious that but for it the [defendant] probably would have been acquitted.'" *Pierson*, 925 F.3d at 924 (quoting *United States v. Remsza*, 77 F.3d 1039, 1044 (7th Cir. 1996)).

### a. There was no prejudice in this case.

The facts in this case are quite similar to those in *Pierson*, in which we were "confident that if no constructive amendment had occurred, the verdict would have been the same."

*Pierson*, 925 F.3d at 926. In *Pierson,* the government indicted the defendant for being a felon in possession of a specific gun, a Taurus, found in the defendant's car. At trial, however, the government presented evidence about another Taurus, found in the defendant's house, which had not been included in the indictment. The jury instructions, like those here, asked jurors to determine whether the defendant was guilty or not guilty of possessing a firearm without identifying which firearm. The court concluded that the "combination of the evidence and untailored jury instructions added up to a constructive amendment." *Id.* at 920. The court went on to find, neverthe-less, that several factors worked "to counter the possibility of a conviction outside the terms of the indictment." *Id.* at 926. Those factors included the ample evidence that the defendant possessed the gun described in the indictment, the govern-ment's closing argument instructing the jury to focus on the weapon in the indictment, and the fact that the jury had a copy of the indictment during deliberations. The court ulti-mately found "no prejudice that would authorize an appellate court to find a reversible plain error." *Id.*

> b.  *The government sufficiently focused the jury on the am-ple evidence that Coleman possessed the Glock.*

In this case we are similarly confident that the verdict would have been the same even with the assumption that the jury instructions, combined with the evidence at trial, con-structively amended the indictment. The jury heard compel-ling evidence that Coleman possessed the Glock identified in the indictment—officers found it in the apartment building that Coleman owned, resting underneath the mattress on which Coleman was sleeping. S*ee United States v. Tate*, 97 F.4th 541, 549 (7th Cir. 2024) (finding that locating a gun under the

mattress of the defendant was sufficient to support a finding of constructive possession). Coleman does not dispute that the jury was properly instructed on the legal requirements for possession. The government also presented the testimony of experts in drug crimes who explained the connection between weapons and their use in drug distribution.

Although the government's presentation included information about a Ruger pistol in the apartment's office and a Hi-Point .40-caliber handgun in the house next door (also owned by Coleman), the government repeatedly drew the jury's attention to the Glock and the fact that the Glock was the gun to which the indictment referred. In its opening statement, the government explained, "Count 4 alleges possession of a firearm as a convicted felon. Again, you are going to hear about the Glock handgun that was hidden underneath the mattress in [Coleman's] apartment." R. 336 at 42, Tr. 42.[3] In closing, the government reiterated that it needed to prove that "the defendant knowingly possessed a firearm. And just to remind you, Exhibit 15A, that's the firearm in question. It's the Glock found at the apartment building." R. 338 at 39, Tr. 410. Thus at both the start and end of the trial, the government linked the Glock, and only the Glock, to the felon-in-possession charge in the indictment. The government also referred the jury to a photograph showing that the "Glock was found in between two mattresses in that bed," and declared that the government had met the burden of proving that Coleman

---

[3] The firearm count was presented to the jury as "Count 4" even though it was originally Count 8 in the Third Superseding Indictment. *See* R. 338 at 25, Tr. 396; R. 319. Several of the counts from the Third Superseding Indictment were dismissed before trial, thus changing the labeling of the counts.

knowingly possessed the Glock. *Id*. The government did not show photographs of where officers located the other two guns.

> c.  *The government proved the interstate nexus only for the Glock.*

Importantly, in any federal case involving a felon-in-possession charge, the government must prove that the weapon was "in or affecting commerce." 18 U.S.C. § 922(g)(1). The government set forth that proof for the Glock only, informing the jury that Coleman had stipulated to the interstate commerce nexus of the Glock. R. 337 at 172, Tr. 339; R. 338 at 39, Tr. 410. The court, likewise, instructed the jurors that they could not find Coleman guilty of Count 4 (possessing a firearm after being convicted of a felony) unless they found that the gun had travelled in interstate commerce. R. 315 at 24. Coleman argues in his reply brief that "the government argued during closing arguments that the jury did not need to think about that [the interstate nexus] element." Reply Brief at 7 (citing R. 338 at 39, Tr. 410). The government did not, in fact, tell the jury they "need not think about" that element. To the contrary, the government informed the jury that the parties had stipulated that the "possession of the firearm was in or affecting commerce," and explained to the jury that the stipulation meant that the parties agreed that the government met the burden of proving the element. R. 338 at 38–39, Tr. 409–10. Because of the stipulations, the government

explained, it had but one remaining element to prove to the jury: that Coleman "knowingly possessed" the Glock. *Id.*

> d. *The evidence of other weapons was not used to prove the felon-in-possession charge.*

In contrast to the Glock, the government never set forth any proof about the interstate travel of the Ruger and Hi-Point firearms. In fact, the government presented very little evidence or argument about those weapons at all. The mere fact of their recovery was mentioned by one of the warrant-executing officers in a simple explanation about each gun. *See, e.g.,* R. 337 at 25, Tr. 193 ("Q. Do you recognize Exhibit Number 5? A. I do. Q. And what is it? A. It is a Ruger handgun. Q. And where was that Ruger handgun recovered? A. It was located in an office style room in the apartment."); *see also* R. 337 at 12, Tr. 179 (similar brief exchange about the Hi-Point). The government mentioned those guns briefly twice in closing argument, but each time for a specific purpose other than proving a felon-in-possession charge. For example, five pages into the transcript of the government's closing, the lawyer for the government listed the evidence that demonstrated Coleman's intent to advance the conspiracy, including: his provision of the drugs and the drug phone to Owens, keeping large amounts of cash on hand, hosting the drug runners in his apartment building, profiting from the conspiracy, and keeping guns which the government's expert witness testified were essential tools of the drug trade. R. 338 at 33–34, Tr. 404–05. To round out this last claim—that Coleman had weapons to advance the conspiracy—the government stated:

> We also know that the defendant had guns, multiple guns, and we know this from the search warrant. There was a GLOCK recovered,

> a Ruger. Both of those came from the apartment
> building at 4104 Madison. There was a third
> gun, a Hi-Point firearm recovered from the
> house next door. And both of those properties,
> we know from the evidence, belonged to the de-
> fendant.

R. 338 at 34, Tr. 405. The government also referred to the other weapons to support the claim that Coleman intended to distribute the drugs. Most often, people who possess drugs for their own personal use do not need weapons to protect the drugs. The government's expert witness explained that people who distribute drugs are vulnerable to theft and violence and use weapons as tools of the trade. To make this point the government lawyer noted that:

> the defendant's intent to distribute can also be
> inferred from some of the other items found
> during the search warrant execution. We have,
> as you know, three guns that were found there:
> The GLOCK, the Ruger, and the Hi-Point. They
> were there, we know from [the expert's] testi-
> mony, to protect the drug dealer, his profits, and
> his drugs.

R. 338 at 42, Tr. 413. Similarly, the reference to multiple guns in the government's opening statement occurred in the context of defining a felon-in-possession charge. *See* R. 336 at 41, Tr. 41 ("they found firearms. And the firearms were something that [Coleman] wasn't supposed to possess at all because he had a felony conviction."). The only other mention of other weapons came at the end of the closing argument when the government mentioned "guns" in its list of evidence proving guilt. R. 338 at 70, Tr. 441 (listing all the evidence as:

"The audio recording and video recordings of the buys; the testimony of Owens and David Maldonado; all the law enforcement agents; everything found at the search warrants, the guns, the cash, the cell phones, the drugs; the multiple IDs of the defendant's voice").

In sum, the government mentioned other weapons in an attempt to fill out the contours of the counts involving Coleman's intent to advance the conspiracy and to distribute drugs. For the purpose of assessing whether the government expanded the terms of the indictment on the felon-in-possession charge, we focus on the court's instructions to the jury on that charge and whether those instructions expanded the indictment. We turn to those instructions now.

### e. The jury instructions and verdict form referred to the indictment.

It is true that the jury instruction regarding Count 4 did not indicate a particular firearm despite the indictment's specificity about a Glock with a distinct serial number. Nevertheless, the jury instructions pointed the jurors back to Count 4 of the indictment by telling them that they had to consider whether the government proved guilt "[a]s to Count 4 of the Indictment," the felon-in-possession charge that specifically identified the Glock. R. 319 at 1; R. 146 at 8. And if that were not enough, the district court judge directed the jury that Coleman was on trial for charges in the indictment, including "Count 4, possessing a firearm after being convicted of a felony," and only "for the charges in the Indictment, not for any other crimes." R. 336 at 24, Tr. 24; R. 338 at 19, Tr. 390. These are the types of connections and clarifications that we have

said minimize the risk of jury confusion and constructive amendment. *Pierson*, 925 F.3d at 922–23.

In his defense at trial, Coleman argued that the Glock belonged to Owens, not him. Coleman asserts on appeal that the jury rejected other parts of Owens's testimony and may have been similarly disinclined to believe her denial of ownership of the Glock. But because the jury could rely on two other guns for the verdict, Coleman argues, they did not need to consider this theory. The jury instructions made clear, however, that the jurors could only convict if they found all of the elements of Count 4, which included the interstate commerce nexus requirement. There was only one gun for which the jury could have found that the government met that requirement—the Glock. Even had the jury fully rejected Owens's testimony that the Glock was not hers, it could not have convicted Coleman for being a felon in possession of the Ruger and Hi-Point. The government made no attempt to prove the elements of a felon-in-possession charge for those guns, and, to the contrary, told the jury in both the opening and closing arguments that the Glock was the handgun in question in the felon-in-possession charge. R. 336 at 42, Tr. 42; R. 338 at 39, Tr. 410. We conclude, therefore, that any constructive amendment would not have affected Coleman's substantial rights.

### 3. The law on constructive amendment is now clearer.

This conclusion precludes any need to look further at the elements of plain error, but given the evolving state of our circuit's law on what it means for a constructive amendment to constitute plain error, we think it warrants a few more words. In *Pierson*, we concluded that the error was not plain for three main reasons: the law had not yet been settled, our caselaw had not yet provided guidance as to what kinds of statements

by the government or instructions by the court might ward against constructive amendment, and the Supreme Court had not yet provided direct guidance for the analysis. The *Pierson* decision, however, significantly clarified at least part of this court's jurisprudence on constructive amendment by warning jury-instructing courts and instruction-proposing lawyers that this exact type of mismatch between a narrow indictment and the pattern jury instruction risked creating a constructive amendment:

> The court risked constructive amendment by not tailoring the pattern jury instructions to the specifics of the case. When the indictment narrows the basis for conviction by adding specifics to an element of the crime, as it did here, the district court should adjust the pattern instructions to ensure the defendant stands to be convicted for precisely what was charged in the indictment. … *Where the indictment makes a particular firearm an essential element of the offense as charged, the court's jury instructions should be adjusted to include that essential element.* If jury instructions are tailored to the specific charges in the indictment, constructive amendments are less likely to occur.

*Pierson*, 925 F.3d at 922 (emphasis ours).

We reassert that advice in the hopes of providing further guidance for those crafting jury instructions. Nevertheless, because we stop at the prejudice prong of plain error review, we need not consider under what other circumstances we might find plain error based on the constructive amendment of a jury instruction. Our conclusion that Coleman was not

prejudiced is supported by the ample evidence that he possessed the Glock, the dearth of evidence about the other firearms, and the written and oral instructions to the jury which tied the necessary proof to Count 4 of the indictment.

## B. The "Newly Discovered Evidence."

Coleman alleges that it was only at the sentencing hearing that he learned for the first time that the surveillance recordings were "basically useless." Coleman Brief at 35 (quoting R. 370 at 51, Sent. Tr. 51). At that hearing, the exchange between Officer Murray and Coleman's trial counsel about the surveillance recordings proceeded as follows:

> Q. And wasn't there, in fact, a van or something parked outside with surveillance equipment in it?
>
> A. Yes, there was.
>
> Q. And wasn't there a problem with retrieving that information?
>
> A. We had several problems with that van, yes.
>
> Q. Okay. So if I never got through discovery any of those surveillance videos, it's because they were deficient or defective?
>
> A. Correct.
>
> Q. Okay. Not because you didn't want to turn it over; just because—
>
> A. No. We had technical issues with the software we were using and the placement of the van. There was no—it was just basically useless.

Q. Yeah. Did you ever turn those over to the government?

A. Well, we couldn't—I don't believe we did because we could not watch most of it ourselves.

Q. Was it just discernible? Was there nothing on it? Was it just black? Blank?

A. So the software was so fuzzy that you couldn't see if it was night, if it was day. It didn't record the entire time frame. I don't recall us even turning it over because it was just ineffective equipment.

Q. Okay. Did you ever have it examined by experts to make sure?

A. We did.

Q. You did?

A. We did.

Q. Okay. And did any of that information, the reports of the experts or the fuzzy tapes or anything like that, ever get turned over to the government?

A. No. So we—you couldn't record. So it goes through a software system, and then trying to watch it from the software system and put it into a recording was a technical issue that couldn't be done. So we had technicians assisting us from DEA, and I believe the whole thing just got scrubbed.

Q. So it was never turned over to the government?

A. There was nothing to turn over.

R. 370 at 51–52, Sent. Tr. 51–52.

Coleman claims that this was new information—that until that time he had assumed that there were recordings based on Murray's attestation in the affidavit seeking a warrant which stated:

> In late June 2018, Investigators placed a surveillance van in front of 4120 and 4104 Madison. For five days, it *recorded* foot and vehicle traffic in the area. *The recording showed* runners coming and going from the east door of the apartment building at 4104 Madison Street between the hours of approximately 8am and 9pm on a daily basis. On numerous occasions, OWENS and/or Lamont COLEMAN exited the apartment building's south door and entered the ranch house next door at 4120 Madison. OWENS and/or Lamont COLEMAN only briefly stayed in the house before returning to the apartment building through the south door. Shortly thereafter, runners would leave 4104 Madison to deliver heroin. Investigators had observed Katrina OWENS and Lamont COLEMAN conduct this same activity prior to several of the controlled purchases detailed above in this Affidavit.

R. 190-1 at 11 (emphasis ours).

Murray's testimony during the sentencing was not the first time that the video recordings were mentioned during

the proceedings, however. At trial, Detective Slatton testified that officers parked a surveillance van with recording equipment outside of Coleman's apartment for several days. According to Slatton, the officers could watch in real time and pan the camera around as they watched. But even if they were not watching, the camera recorded constantly. As described earlier, he also testified that at some point "there was something wrong with" the recordings. R. 336 at 105, Tr. 105. Slatton testified that "the results of that surveillance, I believe, were of us seeing the runners constantly coming and going. I also believe Katrina Owens was seen on the video walking down the streets. Some other activity, I believe, with the vehicles outside. … I couldn't recall off the top of my head everything that was on that video for three days." *Id.* There was no further reference to the recordings at trial, nor any explanation about what happened to them.

For the moment, we will set aside the question as to whether Officer Murray's testimony at the sentencing hearing contained new information or merely a more complete exposition of Detective Slatton's description at trial. We will also suppress our curiosity as to how Coleman's trial counsel, despite seeing the warrant application, had never requested access to the recordings described therein. Coleman's trial counsel moved to withdraw following the sentencing evidentiary hearing and his new counsel filed the motion for a new trial. But as we discuss below, no *Franks* hearing was necessary to resolve these questions.

Coleman makes three claims about this "newly discovered evidence." First, he claims that the post-trial revelation entitles him to a new trial; second that, at the least, the case should be remanded so that the district court can hold a second

*Franks* hearing to determine the extent of the misinformation; and third, the government committed a *Brady* violation. Coleman cannot prevail on any of these claims.

### 1. New trial or *Franks* hearing.

Federal Rule of Criminal Procedure 33 authorizes a district court to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review a district court's rulings on a motion to grant a new trial with great deference, looking only for an abuse of discretion, and bearing in mind that the "'exercise of power conferred by Rule 33 is reserved for only the most extreme cases.'" *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018) (quoting *United States v. Peterson*, 823 F.3d 1113, 1132 (7th Cir. 2016)).

In seeking a new trial, the defendant must demonstrate that the new evidence "(1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) probably would have led to acquittal." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (quoting *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016)).

In this instance, Coleman argues that the newly discovered evidence revealed a falsehood on the warrant application. A criminal defendant who alleges that a warrant was materially inaccurate or incomplete may be entitled to a *Franks* hearing to determine whether facts were deliberately or recklessly omitted from the warrant application. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). In this case, therefore, the requirements for a new trial under Rule 33 and for a *Franks* hearing overlap.

To obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing (1) that the warrant application contained a material falsity or omission that would alter the issuing judge's probable cause determination, and (2) that the affiant included the material falsity or omitted information intentionally or with a reckless disregard for the truth." *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019).

As is clear from the requirements for a new trial pursuant to Rule 33 and for a *Franks* hearing, the defendant must make a showing that the allegedly new information about falsehoods in the warrant application was material. In the *Franks* context, materiality means that the new information would have "alter[ed] the issuing judge's probable cause determination." *Clark*, 935 F.3d at 563. And under Rule 33, materiality means that the new evidence probably would have led to a different outcome at trial. *See, e.g.*, *United States v. Kawleski*, 108 F.4th 592, 600 (7th Cir.) (no showing that new evidence probably would result in an acquittal), *cert. denied*, 145 S. Ct. 602 (2024); *Coscia*, 4 F.4th at 470 (defendant did not carry burden of demonstrating that the new information would seriously call into question the jury verdict.). A decision that the new information would not have altered any outcomes, therefore, would make Coleman ineligible both for a new trial and a *Franks* hearing.

Coleman argues that the new evidence about the video failure would have been material as it "could have potentially caught Murray in a blatant lie"—a lie which Coleman then would have used in the pretrial suppression proceedings to impeach Murray and subsequently to suppress any evidence found pursuant to the execution of that warrant. Coleman Brief at 38. Our precedent, however, requires us to presume

that an affidavit supporting a search warrant is valid, "based on the assumption that, when law enforcement officers make a factual showing to a neutral and detached magistrate, it 'will be a truthful showing.'" *United States v. Taylor*, 63 F.4th 637, 649 (7th Cir. 2023) (quoting *Franks*, 438 U.S. at 164–65). "The presumption of validity is not easy to overcome." *Id.* at 650; *see also United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013) (noting the difficulty for a defendant to make the substantial preliminary showing required under *Franks*).

To overcome this presumption takes more than a bald assertion that the swearing witness "could have potentially" been caught in a lie, as Coleman says. It is the defendant's burden under *Franks* to "make a substantial preliminary showing that law enforcement knowingly and intentionally, or with reckless disregard for the truth, made either a false material statement or a material and deceptive omission in the underlying warrant affidavit." *Taylor*, 63 F.4th at 649. To do so, "[t]he defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses." *Id.* at 650 (internal citations omitted). Only once that burden has been reached does the Fourth Amendment require an evidentiary hearing on the veracity and completeness of the affidavit. *Id.*

Coleman has not offered any specific support for his claim that Murray lied in the warrant application, as his burden of production requires. He has offered no sworn statements of witnesses. He provides no "direct evidence of the affiant's state of mind or circumstantial evidence that the affiant had a subjective intent to deceive based on the nature of the omissions." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014).

He offers only the conclusion that of all the possible explanations for Murray's use of the word "recording," the only one, or at least the most likely one, is that there were no recordings at the time of the warrant application, Murray knew this to be true, and knowingly and intentionally misled the court.[4] This conclusory assertion is insufficient to rebut the presumption that the warrant affidavit was valid and entitle Coleman to an evidentiary hearing. *See Franks*, 438 U.S. at 171; *United States v. Vines*, 9 F.4th 500, 512 (7th Cir. 2021) (conclusory statements that misrepresentations and omissions were "material" are insufficient to preserve a challenge to the district court's holding that the warrant established probable cause).

The district court listened to Murray's testimony at the first *Franks* hearing and again at sentencing, along with Detective Slatton's testimony at trial. The court made a factual conclusion, which we disturb only if we find clear error, that the evidence and testimony "establish[ed] that the

---

[4] Based on Slatton and Murray's testimony, there are myriad alternative explanations for Murray's reference to the recordings in the affidavit, including but not limited to the following: the recordings may have existed at the time he submitted the affidavit in support of the search warrant and then were later ruined as they were being uploaded to the cloud, as the district court assumed; the recordings may have already been ruined when Murray submitted the affidavit, but Murray was unaware of that fact; Murray or the officers reporting to him may have watched the events unfolding on the recording equipment screen as it was being recorded, and assumed that in addition to being broadcast on the screens in real time, they were also being successfully recorded; Murray could have known that there were no recordings, but used the term "recordings" colloquially to mean events captured and watched in real time on video screens.

investigators had real time access to the video feed from the surveillance van and the outside activity was being video recorded. However, due to software problems, the recorded data failed to transfer into a usable format." R. 397 at 10 n.4; *see also United States v. Osterman*, 119 F.4th 1090, 1095 (7th Cir. 2024) (the court of appeals reviews a district court's factual findings, including those made in a *Franks* hearing, for clear error only). The court made no clear error by concluding that the officers observed the activities to which they attested, and that the officers recorded video even if the video was ultimately lost.

But perhaps most importantly, even if the *Franks* hearing revealed that Murray deliberately and recklessly or intentionally intended to mislead the court by discussing "recordings"—and there is nothing that leads us to believe that he did—Coleman cannot demonstrate that Murray's misleading statements would have altered the issuing judge's probable cause determination. *See Clark*, 935 F.3d at 563. A statement is not "material" to the warrant if, when the court sets it aside, probable cause remains. *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003).

And here, the warrant contained more than sufficient evidence of probable cause for the search, even without the controverted paragraph. The key to linking Coleman with the illegal activity was not the video recordings themselves, but the events and activities that the recordings captured. The investigators could have established evidence of those activities in many ways—among them by observing Coleman's behavior directly or through closed circuit video, by observing video evidence of Coleman's activity before it was ruined, or through information given to investigators by reliable sources

like informants or undercover officers. Coleman argues that "[i]f the allegations about the recordings were struck from the affidavit, the main fact tying Coleman to the conspiracy would have been the allegation that some informant identified him as the kingpin and man who took drug calls." Coleman Brief at 40. But the "non-recording" evidence consisted of far more. After all, the video recorded for a mere five days, but the warrant application contained law enforcement observations made over more than nine months. Video or no video, an officer's sworn affirmation about what the officer observed is sufficient to establish probable cause. *See, e.g.*, *United States v. Miles*, 86 F.4th 734, 741–42 (7th Cir. 2023) (finding probable cause to search a house for drugs based on observations during controlled buys, where the seller left a location, obtained drugs from the house, and returned to complete the sale.); *United States v. Kelly*, 772 F.3d 1072, 1076 (7th Cir. 2014) (finding probable cause to search Kelly's residence based on observations of Kelly selling drugs to an informant from behind the residence and the officer's experience that drug dealers are likely to keep contraband in their residences.).

The warrant application also asserted that confidential informants and undercover officers conducted deals with "KD" (a name that the officers knew to be tied to Coleman), and with "Trina"— a name they linked to Owens, who they contended was not only Coleman's girlfriend, but also a member of the conspiracy. The warrant application vouched for the reliability of all three confidential informants with specific details regarding their trustworthiness. The affidavit also noted several other connections between the drug activity and Coleman: "investigators observed" Owens and Coleman exit the apartment building's south door, go into the neighboring house, stay for a brief time, and then return to the apartment,

shortly after which the drug runners completed the deals; Coleman's relationship with the drug runners who came and went from the apartment building that he owned; and the fact that his personal phone was often in contact with the phone known to be used for the drug transactions. None of that observational evidence relied on the video recordings. In any event, a warrant affidavit need not be correct in every assertion, nor must it provide every detail of an investigation. *Taylor*, 63 F.4th at 648. Because the reviewing judge had ample evidence to support the warrant, even without any evidence of the recordings, any falsehood, had there been one, would not have altered the probable cause determination, and thus was not material. *See, e.g.*, *United States v. Roland*, 60 F.4th 1061, 1065 (7th Cir. 2023) (quoting *Glover*, 755 F.3d at 820). And if it would not have altered the assessment of probable cause for purposes of assessing materiality for a *Franks* hearing, it also could not have had any material effect sufficient to warrant a new trial pursuant to Rule 33, as it could not have created a likelihood of a different outcome. *See, e.g.*, *United States v. Jones*, 79 F.4th 844, 860 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2662 (2024).

### 2. The *Brady* claim.

Coleman lodges his final claim of harm from the allegedly new evidence in the form of a *Brady* claim. In *Brady v. Maryland*, the Supreme Court held that the government violates the due process rights of a defendant if it suppresses any material evidence favorable to the defendant's case. *Brady*, 373 U.S. at 87. For *Brady* purposes, the evidence is material only if there is a reasonable probability—that is, one sufficient to undermine confidence in the outcome—that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different. *United States v. Bagley,* 473 U.S. 667, 682 (1985). To establish a *Brady* violation Coleman must demonstrate that the government suppressed evidence, the evidence was either exculpatory or impeaching, and that prejudice resulted. *United States v. Mitrovich*, 95 F.4th 1064, 1071 (7th Cir. 2024). The materiality and prejudice requirements of the *Brady* analysis reorients us back to the discussion of materiality above. Coleman cannot demonstrate that there is a "reasonable probability" that the result of the trial would have been different had the jury seen the suppressed evidence. *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) (quoting *Kyles v. Whitely*, 514 U.S. 419, 422 (1995)). For all of the same reasons that the allegedly new evidence would not have altered any outcome of the proceedings, we also conclude that the *Brady* claim fails.

## C. Leroy Coleman's Affidavit.

At sentencing, Coleman objected to the recommendation in the presentencing report that he receive a two-level enhancement for obstructing justice by attempting to influence the testimony of his uncle and co-conspirator, Leroy. The government presented evidence at sentencing about a phone call between Leroy and Coleman in which Leroy expressed concern about testifying at Coleman's trial. In that call, Coleman urged Leroy to testify that he did not recognize Coleman's voice on the recordings of the phone calls, and that it was Leroy, not Coleman, who was the leader and built the operation with Owens. Coleman said to Leroy that if he testified accordingly, Coleman would be "out tomorrow." R. 347-2 at 2.

At the sentencing hearing, Officer Murray testified that law enforcement conducted numerous interviews with Leroy,

who they determined was an unreliable witness as he "continually changed his story after speaking with Lamont Coleman or anyone else from the family." R. 370 at 44, Sent. Tr. 44. Defense counsel also acknowledged that "Leroy is a mixed bag" (*Id.* at 84), but nevertheless introduced a handwritten notarized statement from Leroy dated July 31, 2021. In that document, Leroy declared:

> On or around April 28, 2021 I Leroy Coleman, during a phone call with Lamont R. Coleman stated that "me and Trina ran the operation. Lamont R. Coleman was either at work or at school. I also stated that I was caught on video and audio conducting drug transactions." Lamont R. Coleman did not threaten, intimidate, or unlawfully influence my statements.

R. 370 at 73, Sent. Tr. 73. Defense counsel informed the court that Coleman gave him the affidavit, but he knew nothing else about its origin. Neither Coleman nor the government called Leroy, and Coleman did not present any further evidence about Leroy or his affidavit at the sentencing hearing.

The court eventually declared the affidavit inadmissible, reasoning as follows:

> At the evidentiary hearing, Mr. Coleman submitted a purported affidavit from Leroy affirming that he made such statements during the phone conversation. While the Court allowed the defense to mark the affidavit as a hearing exhibit, the affidavit is not admissible into evidence. Leroy did not testify at the hearing and it is unknown whether he actually wrote the

> affidavit and whether it is actually notarized. In fact, no testimony was offered about the foundation for the affidavit so as to indicate any indicia about its reliability. But even if the affidavit were admissible, it would change nothing as what it states is inconsistent with the trial evidence about the roles of each member of the conspiracy.

R. 371 at 13 n.3.

"A 'defendant has a due process right to be sentenced on the basis of reliable information.'" *United States v. Tankson*, 836 F.3d 873, 881 (7th Cir. 2016) (quoting *United States v. Zehm*, 217 F.3d 506, 514 (7th Cir. 2000)). At sentencing, a judge has great latitude in admitting evidence, like hearsay, that might otherwise not be admissible at trial, but the district court must ensure that "the information has sufficient indicia of reliability to support its probable accuracy." *United States v. Barker*, 80 F.4th 827, 833 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2621 (2024); *see also* U.S.S.G. § 6A1.3(a). We review those determinations for an abuse of discretion. *Tankson*, 836 F.3d at 881.

Coleman argues that affidavits can be self-authenticating under Federal Rule of Evidence 902(8), and need not require extrinsic evidence of authenticity for admission. It is true, in the usual course of events, that an affidavit may be sufficiently reliable on its face at least to warrant admission. But it would be wholly inaccurate to assume that a district court must accept an affidavit as reliable simply because it allegedly has been sworn before a notary public. *See, e.g.*, *United States v. Amerson*, 185 F.3d 676, 683 (7th Cir. 1999) (affirming district court judge's decision to exclude affidavit as unreliable); *United States v. Wilkus*, 875 F.2d 649, 654 (7th Cir. 1989) (same).

In this case, in assessing reliability, the district court heard evidence that Leroy was an unreliable witness—so unreliable, in fact, that neither side wanted to call him. Coleman did not wish to call him as a witness but nevertheless wanted the court to admit an affidavit from him that would not be subject to cross examination. Moreover the sentencing judge heard evidence that Leroy's story pivoted every time he spoke to Coleman or someone from his family. And the court also knew that Leroy had entered a plea agreement that identified him as a minor participant, but that the affidavit alleged otherwise. It is true that a court can admit an affidavit as evidence and later discredit the truth of information contained within it. But when the circumstances under which the affidavit arrived before the district court judge are as suspect and unreliable as they are here, it certainly is not an abuse of discretion for a district court to deny its admission for lack of reliability.

### D. <u>Acquitted Conduct.</u>

In his final claim, Coleman hopes to preserve for the Supreme Court the question of whether the district court erred by considering, at sentencing, conduct for which the jury acquitted him. Coleman concedes, as he must, that this argument is foreclosed by the Supreme Court's holding in *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), and our circuit's interpretation of *Watts* in which we have held that a sentencing judge may consider acquitted conduct in calculating a sentence, so long as that conduct has been proved by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction. *See, e.g.*, *United States v. Robinson*, 62 F.4th 318, 320 (7th Cir.), *cert.*

*denied*, 144 S. Ct. 96 (2023); *United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 2400 (2023).

In denying the petition for certiorari in *McClinton*, four Supreme Court justices encouraged the United States Sentencing Commission to resolve questions around the use of acquitted conduct at sentencing. *McClinton v. United States*, 143 S. Ct. at 2400–03 (Sotomayor, J., respecting the denial of certiorari) (noting that the Sentencing Commission had forecasted its plan to imminently resolve questions around acquitted-conduct sentencing, but declaring that "[i]f the Commission does not act expeditiously or chooses not to act, however, this Court may need to take up the constitutional issues presented."); *Id.* (Kavanaugh, J. joined by Gorsuch, and Barrett, JJ., respecting the denial of certiorari) ("It is appropriate for this Court to wait for the Sentencing Commission's determination before the Court decides whether to grant certiorari in a case involving the use of acquitted conduct.").

Ten months later, the Sentencing Commission heeded the call, passing an amendment to revise the United States Sentencing Guidelines such that they now state, "Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. 1B1.3(c) (effective November 1, 2024).

The Guideline revision, however, does not have retroactive effect. The Guidelines allow for retroactive application only for amendments specifically listed in U.S.S.G. § 1B1.10(d). The amendment at issue here is not listed in subsection (d) and thus does not have retroactive effect. *See, e.g., United States v. Botsvynyuk*, No. 24-3253, 2025 WL 943404, at *2

(3d Cir. Mar. 28, 2025); *United States v. Ashford*, No. 23-3395, 2025 WL 79910, at *2 (8th Cir. Jan. 13, 2025)

The Sentencing Guideline change may not have retroactive effect, but if Coleman's sentence was based on a rule that the Supreme Court deems unconstitutional, and that rule prejudiced Coleman, he is likely entitled to a remand for resentencing. In *United States v. Paladino*, we held that, because mandatory sentencing guidelines violated the Sixth Amendment, any defendant prejudiced by a sentence handed down under that illegal regime was entitled to a remand for resentencing. 401 F.3d 471, 483 (7th Cir. 2005). "It is a miscarriage of justice to give a person an illegal sentence that increases his punishment, just as it is to convict an innocent person." *Id.*

The Supreme Court, of course, has not ruled that increasing a defendant's sentence on the basis of acquitted conduct violates the Sixth Amendment. At least nine Supreme Court justices, however, over the course of various time periods, have expressed some level of concern with the practice. *See McClinton*, 143 S. Ct. at 2400–03 (Justices Sotomayor, Kavanaugh, Gorsuch and Barrett all noting that the use of acquitted conduct at sentencing raised important issues that needed to be decided); *Jones v. United States*, 574 U.S. 948 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., dissenting from denial of certiorari) (opining that a sentencing judge cannot use acquitted conduct as "any fact necessary to prevent a sentence from being substantively unreasonable— thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge.") (emphasis in original); *Watts*, 519 U.S. at 170 (Stevens, J., dissenting) ("The notion that a charge that cannot be sustained by proof

beyond a reasonable doubt may give rise to the same punishment as if it had been so proved is repugnant to that jurisprudence."); *Id.* (Kennedy, J., dissenting) ("[T]o increase a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal."); *see also United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of reh'g en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.) ("It is far from certain whether the Constitution allows" a district judge to increase a defendant's sentence within the statutorily authorized range "based on facts the judge finds without the aid of a jury or the defendant's consent."); *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("To be sure, we understand why defendants find it unfair for district courts to rely on acquitted conduct when imposing a sentence.").

It is not unreasonable for Coleman to hold out hope that arguments like those set forth by Justice Scalia in *Jones* might prevail, and a majority of the Court will find that the "Sixth Amendment is violated when courts impose sentences that, but for a judge-found fact, would be reversed for substantive unreasonableness." *Jones*, 574 U.S. at 948 (Scalia, J., dissenting). But we are not certain whether such a change would benefit Coleman. Coleman argues that the district court judge ignored the jury's verdict which it describes as "acquitting Coleman of the controlled buys and seemingly rejecting any testimony that Coleman was the head of the drug operation." Coleman Brief at 51. The jury, however, never acquitted

Coleman of being a leader of the conspiracy. There was no such charge in the indictment, rather it was merely an enhancement that the judge considered at sentencing. In other words, it does not appear that the district court judge used acquitted conduct in considering Coleman's sentence. But in any event, the issue has been preserved, and we must await a decision in a future case as to whether a sentence based on acquitted conduct violates the Constitution. In the meantime, for the reasons described above, the decision of the district court on all matters is

AFFIRMED.